1 | **CHARLES J. FLEISHMAN**
Bar# 46405
2 | A Professional Corporation
8383 Wilshire Blvd., Suite 1030
3 | Beverly Hills, California 90211-2495
erisa@erisarights.com
4 | Telephone: (323) 653-9772
FAX: (323) 852-0871
5 | Attorney for Plaintiff

6

7

8 | **UNITED STATES DISTRICT COURT**

9 | **NORTHERN DISTRICT OF CALIFORNIA**

10

11 | MARIE CHELLINO                              )     NO. C07-3019 CRB
                                              )
12 |          Plaintiff,                        )     PLAINTIFF'S MOTION
                                              )     FOR SUMMARY JUDGMENT
13 |      vs.                                   )
                                              )     Date:  March 28, 2008
14 | KAISER FOUNDATION HEALTH PLAN, Inc )     Time:  10:00 a.m.
a corporation; DOES 1                  )     Courtroom 8
15 | through 10, inclusive,                     )     Judge Charles R. Breyer
                                              )
16 |          Defendants.                       )
                                              )
17 | ─────────────────────────────────────

**TABLE OF CONTENTS**

18 | INTRODUCTION                                                          3

19 | THE FACTS OF THE CLAIM                                                3

20 | LEGAL DISCUSSION                                                     12

21 | CONCLUSION                                                           16

22

23

24

25

26

27

28

1

**TABLE OF CASES**

2 | Abatie v. Alta Health 458 F.3d 955 (9th Cir. 2006) | 9, 12, 13, 14

3 | Blau v. Astue No. 05-35891 (9th Cir. Nov. 8, 2007) | 7

4 | Byrom v. Delta 343 F.Supp.2d 1163 (N.D. Ga 2004) | 11

5 | Donaho v. FMC 74 Fed.3d 894 (8th Cir. 1996) | 14

6 | Dorsey v. Provident 167 F.Supp.2d 846 (ED Penn 2001) | 11

7 | Fair v. Bowen 260 F.3d 1044 (9th Cir. 2001) | 7

8 | Hines v. Unum 110 F.Supp.2d 458 (W.D. Va 2000) | 14

9 | Ladd v. ITT 148 F.3d 753 (7th Cir. 1998) | 14

10 | Pinto v. Reliance Standard 240 F.3d 840 (3d Cir. 2000) | 13

11 | Plummer v. Hartford 2007 U.S. Dist. LEXIS 488 (S.D. Ohio) | 10

12 | Pollock v. Citibank 308 F.3d 880 (8th Cir. 2002) | 11

13 | Salley v. DuPont 966 F.2d 1011 (5th Cir. 1992) | 13

14 | Smith v. Continental Casualty 450 F.3d 253 (6th Cir. 2006) | 14

15 | Snow v. Standard 87 F.3d 327 (9th Cir. 1996) | 15

16 | Soron v. Liberty Life 2005 WL 1173076 (N.D.N.Y.) | 10

17 | Stup v. UNUM 390 F.3d 301 (4th Cir. 2004) | 11

18

19

20

21

22

23

24

25

26

27

28

Charles J. Fleishman

## INTRODUCTION

The plaintiff was employed by the Kaiser Foundation as a computer programmer. She became disabled because of severe fibromyalgia on June 27, 1996. Kaiser, at all times relevant, had a disability plan for its employees insured by AETNA Life Insurance Company. The plaintiff had been receiving disability benefits under the plan until Aetna terminated them on August 31, 2006.

To justify terminating the benefits, Aetna relied on a tortured interpretation of a medical opinion that it knew to be false and an incorrect definition of "sedentary work." Further, Aetna denied the plaintiff the full and fair review mandated by ERISA. This case is the poster child case for bad faith and the classic picture of an arbitrary and capricious decision.

## THE FACTS OF THE CLAIM

Ms. Chellino was found by the plan to be totally disabled because of fibromyalgia from June 27, 1996. 1025. She was granted disability benefits and a waiver of life insurance premiums because of her disability. 1017. On September 25, 2000, Ms. Chellino was awarded Social Security Disability benefits. 629.

It appears that Aetna took over the claim from the original insurer of the plan shortly after Ms. Chellino started to receive benefits. Sometime in 2000, Aetna appears to have made a first attempt to terminate the plaintiff's disability benefits. 677. Ms. Chellino hired an attorney and the benefits were eventually reinstated. 663.

In October 2002, Aetna sent a nurse to interview Ms. Chellino at her home. The nurse wrote that disability seemed to be long-term and significant with little prospect for improvement. 747. The plaintiff was described as underweight and malnourished. Ms. Chellino told the interviewer that she enjoys spending time at a stable with a friend's horse; that she rides the horse a maximum of 20 minutes; and that she "tries to walk for twenty minutes once or twice a day and is usually

able to tolerate this." 755.

On July 21, 2003, the plaintiff filled out an Aetna claim form in which she wrote, "I keep my hands/arms supported in my pockets." 36.

On August 5, 2003, the plaintiff's treating doctor, Dr. David Padgett, wrote that Ms. Chellino was totally disabled. He diagnosed her with fibromyalgia, repetitive-strain syndrome and possible thoracic outlet syndrome. 62. Dr. Padgett was interviewed by a doctor from Aetna in September 2003. He told the Aetna doctor that Ms. Chellino "gets out of the house periodically and is able to go to the stable to visit her horse. Recently she did some very limited riding." 58. On May 11, 2004, video taped surveillance of the plaintiff revealed her riding a horse. The plaintiff was also videotaped on May 12 and 15. 18.

On June 16, 2004, the plaintiff, in answering an Aetna questionnaire, said that her daily activities consisted of driving 15 minutes to a stable where she walks alternatively with a horse or a friend for exercise and to socialize with people. 189, 193.

On July 22, 2004, Aetna sent copies of the video surveillance to Dr. Padgett for his comments. 713. Dr. Padgett pointed out that the video did not show that the plaintiff wears wrist braces and a sacroiliac belt and at nighttime she is at home resting with a headmaster collar. 225. Aetna also received the notes of Ms. Chellino's physical therapist. Those notes pointed out that she rides a "quite old and calm" horse for about 15-20 minutes at a time. Further, "She is able to carry 1-2# only and holds items against chest, rarely holds things in hands or by handles." Both her ability to stand and sit were very limited. She is able to drive 15-20 minutes at a time because of a supportive seat and pillows in her car. 229-30.

Medical records obtained by Aetna on February 9, 2005, show that Ms. Chellino was taking narcotic pain medication. 254, 293.

Aetna had Ms. Chellino surveilled again on April 17, 18, and 19, 2005. She

Charles J. Fleishman

1   was filmed leading two horses by ropes, driving a motor vehicle, carrying an
2   empty plastic bucket against her chest, wearing wrist braces and, at times, a neck
3   collar.  3.

4       On June 22, 2005, Ms. Chellino was examined by Dr. Krames, hired by
5   Aetna to perform an independent medical evaluation.  He noted, "She enjoys
6   horseback riding and at the direction of he physician and physical therapist, she
7   has been instructed to visit her horse barn daily, which is a 15 to 20 minute drive.
8   She rides approximately 15-20 minutes at a time.  330.  He concluded, based upon
9   his review of the medical records given to him by Aetna and his one hour
10  examination of the plaintiff, "This patient has not only fibromyalgia but also a
11  history of pituitary adenoma, which may also cause her fatigue and limits this
12  woman's ability to perform tasks of daily living or be employed in any
13  occupation."  337.

14      The entire medical file, the videos and the Krames report were then given
15  to Dr. Rick Snyder, an Aetna employee, to review.  Dr. Snyder never personally
16  met, spoke with, or examined the plaintiff or her treating doctors.  The totality of
17  his knowledge about her is based on what Aetna provided to him for review.  He
18  recognized that Dr. Padgett and Ms. Chellino's physical therapist were of the
19  opinion that she was totally disabled.  He noted that Dr. Padgett wrote that Ms.
20  Chellino "cannot remain sitting or standing at a computer long enough to
21  accomplish work.  He reports that she needs rest breaks and indicates that
22  medications slow her cognitive process. . . . Her medications are refilled to include
23  . . . Norco 10 mg."  Dr. Snyder concluded with regard to Dr. Krames report,
24  "Based on the medical data in the file and with a reasonable degree of medical
25  certainty the physical examination findings from the independent medical
26  examination do not support the claimant is impaired to a less than sedentary
27  capacity."  402-3.

28      Unhappy with his report, Aetna sent Dr. Krames the videos to review.  The

1    transmittal letter made Aetna's position clear to Dr. Krames.    "[R]ecent
2    surveillance reveals Ms. Chellino's physical activity appears to be greater than
3    your assessment at the time of the IME. . . . After review of the surveillance
4    video, would your opinion change regarding Ms. Chellino's capacity?"  410.  The
5    administrative record shows that Aetna was fairly confident that Dr. Krames would
6    change his opinion.  An internal Aetna note states, "Based on past experience, the
7    surveillance could definitely cause Dr. Krames to re-think his opinion."  1334-35.
8    Yet, it appears that Dr. Krames was not going to change his opinion for nothing.
9    He asked for $2100 to review the video, an amount that Aetna described as
10   "excessive."  In the end, Aetna was willing to pay the excessive fee for the right
11   result.  1338, 1341.

12        On February 15, 2006, Dr. Krames wrote his second report.  After reviewing
13   the video, Dr. Krames noted that Ms. Chellino was able to drive a car, was able
14   to shop for herself, and she was able to get on and off a horse.  436.  But that was
15   all known to him when he wrote his first report, the report that found Ms. Chellino
16   to be totally disabled; Dr. Krames knew, from his interview with Ms. Chellino and
17   his review of the medical records that Aetna had given him, that the plaintiff rode
18   a horse regularly, walked 20 minutes a day, drove 15 to 20 minutes at a time, and
19   did light shopping.  So what was in the video that caused him to change his mind?

20        The videos do indeed show Ms. Chellino shopping.  We see her after she
21   has left a grocery store with her purchases in a shopping cart being pushed by a
22   box boy.  The box boy unloads the cart and puts the purchases into the car.  1582
23   @ 1:24 p.m.  This hardly supplements the doctor's knowledge of Ms. Chellino's
24   activities in a direction away from disability.    The videos indeed show Ms.
25   Chellino driving her car, a fact known to Dr. Krames when he wrote the first
26   report.  The videos show nothing spectacular about Ms. Chellino's driving.  As for
27   riding the horse, there are extremes of horse back riding.  There is the riding done
28   in a rodeo or by a jousting knight.  Surely that level of horse riding would not

Charles J. Fleishman

support a disability claim. There has to be another extreme of horseback riding that would not rule out disability because Dr. Krames knew about Ms. Chellino's horse riding when he wrote the first report finding her to be totally disabled. Try to picture that level of horseback riding. Mounting the horse would be a very easy act. The video shows Ms. Chellino mounting the horse from a platform. 1583 @ 5:33 p.m. Other than being lifted onto the horse by a crane, can an easier method of mounting a horse be imagined? Riding the horse, at the disabled extreme, would be very gentle. The video shows the horse, with Ms. Chellino on its back, traveling about 50 feet at the slowest possible speed and then stopping to commune with another horse for a minute or two. 1583 @ 5:35 p.m.

Dr. Krames made some remarkable statements in his second report about Ms. Chellino that are not supported by the surveillance videos. He wrote that she was able to lift relatively heavy objects. Such activity does not appear in the videos. He said that she was able to push and pull at will. There is no pushing or pulling requiring significant force in the videos. He found that she could do fine manual manipulation with very little evidence of manual manipulation at all and in spite of her wearing wrist braces bilaterally. He wrote that the videos show no signs of pain behavior yet noted that Ms. Chellino walked with both hands in her pockets, wrist braces on both arms and, at one time, a neck brace. He knew, or should have known from his review of the Aetna records at the time of the first report, that Ms. Chellino walked with her hands in her pockets to support her hands and arms. The videos do not show extended periods of sitting or standing and Dr. Krames made no mention of the plaintiff's ability to sit or stand. The Ninth Circuit recently wrote in Blau v. Astue No. 05-35891 (9th Cir. Nov. 8, 2007) quoting Fair v. Bowen 260 F.3d 1044, 1049-50 (9th Cir. 2001), "Daily household chores and grocery shopping are not activities that are easily transferable to a work environment, 'where it might be impossible to periodically rest or take medication.'"

In the end Dr. Krames concluded "It is my opinion that she should be able to be employed in an occupation that calls for her to do fine manipulation and to hold object up to 5 pounds."  440.

On March 13, 2006, Dr. Rick Snyder again reviewed the file.  He suggested that there should be additional surveillance and a functional capacity evaluation (FCE).  459.  An FCE was set up.  462.  The FCE was found to be inconclusive because of the plaintiff's complaints of pain.  847.

An Aetna internal note dated June 13, 2006 summarized the situation. **"Multiple internal medical reviews, two IME's and an FCE have not yielded sufficient information to alter the decision to continue paying benefits.  Thus, it is unlikely that additional surveillance would be useful at this time."**  1389.

On July 6, 2006, an Aetna employee of unknown name and qualifications found jobs that a person with Ms. Chellino's background and education could perform for a reasonable wage if the person had sedentary work ability.  1391-95. As will be shown below, there was absolutely no evidence that Ms. Chellino had sedentary work ability.

On August 31, 2006, Aetna sent Ms. Chellino a letter terminating her disability benefits effective August 16. 2006.  841.  The letter noted that Ms. Chellino was surveilled "driving, shopping, walking a horse, riding a horse, walking around a neighborhood, standing and interacting with others."  Not a single one of the activities, alone or together, are incompatible with disability, a fact recognized by Dr. Krames in his first report, Dr. Padgett, the plaintiff's physical therapist, and the anonymous claims person that reviewed the file on June 13, 2006.  1389.  The letter continued explaining that Dr. Krames changed his mind about the plaintiff after viewing the videos.  As pointed out above and as the trier of fact will see, the videos are innocuous.  Aetna then pointed out that an FCE was performed with invalid results.  The invalid FCE was incredibly interpreted to mean that the plaintiff had greater work ability than the medical

1   records and the videos indicated.  According to Aetna, if the claimant is able to
2   perform the tasks of an FCE he is not disabled; if he is unable to perform the
3   tasks, he is faking.  Aetna's medical consultants, the letter said, concluded that Ms.
4   Chellino could perform sedentary work on a full time basis.    The medical
5   consultants that reached the conclusion were not identified and there does not
6   appear to be any document in the administrative record authored by a doctor
7   stating that Ms. Chellino can perform sedentary work.  Even if there were such a
8   document, there is no evidence in the administrative record that supports such a
9   conclusion.  The letter concludes by identifying the sedentary jobs that could be
10  performed by someone with Ms. Chellino's background and education and a
11  sedentary work capacity.

12      The termination of benefits was administratively appealed on November 14,
13  2006.  532.  The appeal asked Aetna to forward a copy of the complete claim file.

14      When the file was reviewed by me, I noted that Dr. Krames was employed
15  for the IME by an organization named NCM.  I asked Aetna about its prior
16  experience with NCM and Dr. Krames.    797.    Aetna refused to give any
17  information.  886.  Aetna was asked twice again about its prior reliance on the
18  two.  541, 550.  Aetna finally replied that "we do not believe that prior medical
19  reviews conducted on other disability claims by Dr. Krames has any relevance to
20  our determination of the facts and circumstances surrounding Ms. Chellino's
21  disability claim."  796.  The Ninth Circuit has decided otherwise.  See Abatie v.
22  Alta Health 458 F.3d 955, 969 (9th Cir. 2006).  The evidence in the administrative
23  record strongly suggests that Dr. Krames is a doctor that Aetna knew it could rely
24  on to come to the opinion that Aetna was looking for.  1334.

25      As part of the administrative appeal, the plaintiff sent Aetna reports from
26  rheumatologist Dr. Rajiv Dixit.  He examined her on November 28, 2006 and
27  found that she was totally disabled and suffering from "longstanding and
28  widespread severe pain" resulting from fibromyalgia.    She also had cognitive

1    dysfunction.  "Her pain requires narcotic analgesia."  546.

2    Part of the administrative record that Aetna sent to me consisted of a CD
3    Rom disk with what was supposed to be the surveillance videos.  The disk is filed
4    concurrently with this Motion For Summary Judgment and marked as Exhibit
5    1585.  Missing from the video was the content of disk 1583, including the
6    sequence showing Ms. Chellino riding a horse.  This was not discovered by me
7    until the official administrative record was sent to me after the denial of the
8    administrative appeal and the beginning of litigation.  Not knowing that I had been
9    given an incomplete version of the surveillance videos, I sent what I had to Dr.
10   Dixit for review.  He wrote, "There is absolutely nothing on the video that would
11   lead me to believe that the patient is not disabled from her fibromyalgia.  Patients
12   with fibromyalgia are able to ambulate normally and are able to do certain
13   activities of daily living especially when they are having a good day.  Patients with
14   fibromyalgia typically have periods of exacerbation and remission and it is not
15   unusual that during a period of relative remission, the patients are able to do some
16   activities of daily living."  549.

17   Aetna was also sent a letter from Dr. Padgett in which he described Ms.
18   Chellino's condition one day after undergoing the FCE.  "She was having a
19   significant flair in her pain.  She was showing neural irritation from her neck
20   to/through he sacrum that greatly reduced function."  801.  Ms. Chellino's physical
21   therapist saw her on May 1, 2006, 4 days after the FCE.  He reported that "she
22   presented with increased symptoms to a severe degree."  803.

23   Aetna had the claim reviewed by a Dr. Alan Marks, no stranger to the
24   courts.  His no disability opinions were rejected in <u>Soron v. Liberty Life</u> 2005 WL
25   1173076 (N.D.N.Y.) and <u>Plummer v. Hartford</u> 2007 U.S. Dist. LEXIS 488 (S.D.
26   Ohio).  On February 19, 2007, he wrote his report.  He never examined Ms.
27   Chellino.  He relied heavily on the video surveillance and the reports of Dr.
28   Krames.  He concluded that "Any person who can care for a horse, lead a horse

1    on walks, and mount and ride a horse, cannot in any reasonable way be thought
2    of as being disabled from work." 893. Thus, even though he claims to have relied
3    on the reports of Dr. Krames, he obviously disagreed with him. Furthermore,
4    while the videos and the medical records can support a finding of Ms. Chellino
5    walking, mounting and riding a horse, there is no evidence that she "cared" for a
6    horse.

7         On February 27, 2007, Aetna denied the administrative appeal. 881. Aetna
8    relied on the opinion of Dr. Marks. Surveillance, Aetna wrote, showed Ms.
9    Chellino "driving, shopping, walking a horse, riding a horse, walking around a
10   neighborhood, standing and interacting with others. These activities are in
11   contradiction to her inability to perform a sedentary occupation." 882. Surely Dr.
12   Krames would disagree. Aetna's conclusion that Ms. Chellino could perform a
13   sedentary occupation developed out of nothing at all.

14        In reaching its decision, Aetna ignored the plaintiff's cognitive dysfunction
15   described by Dr. Dixit; ignored the plaintiff's reliance for pain control on narcotic
16   medications; ignored the fact that the FCE was, as Aetna admitted, "invalid" (882);
17   ignored the contradiction between the opinions of its own Drs. Krames and Marks
18   as to whether or not walking a horse, riding a horse, walking, driving, shopping,
19   and talking to other people preclude disability; ignored case law brought to its
20   attention that an FCE is a poor vehicle for testing disability caused by
21   fibromyalgia (Stup v. UNUM 390 F.3d 301 (4th Cir. 2004), Dorsey v. Provident
22   167 F.Supp.2d 846 (ED Penn 2001), Pollock v. Citibank 308 F.3d 880 (8th Cir.
23   2002), Byrom v. Delta 343 F.Supp.2d 1163 (N.D. Ga 2004)) (556); ignored
24   literature in its administrative record that points out that FCE's are completely
25   unreliable for a number of reasons including lack of research, lack of protocol,
26   lack of uniform criteria, lack of standardization, lack of any ability to project what
27   a person could perform in an 8 hour day, significant safety deficiencies, nearly no
28   peer-reviewed journal articles regarding reliability, and, very significant to this

Charles J. Fleishman

1  case, cannot tell whether the failure of a person to participate in a task indicates
2  malingering or a physical inability to perform the task. The tester could
3  unilaterally conclude, the article points out, without any valid reliable basis, that
4  the patient is not putting out maximal effort. 582.

5  The termination of plaintiff's benefits was arbitrary and capricious and
6  wrong.

## LEGAL DISCUSSION

8  The standard of review to be employed by the court in this ERISA benefits
9  case is the arbitrary and capricious standard of review as modified by <u>Abatie v.</u>
10 <u>Alta Health</u>. 909-10. The Ninth Circuit decided in <u>Abatie v. Alta Health</u>, supra,
11 that when discretion is granted to a claims administrator so that review of a denial
12 of benefits would be for abuse of discretion in the District Court, that review
13 would, generally, remain an abuse of discretion review even if there were serious
14 conflicts of interest affecting the decision maker. This does not mean that the
15 conflict of interest would be ignored. To the contrary, the degree of deference
16 given by the court to a fiduciary's decision will take into account the nature,
17 extent and effect of any conflict of interest and the impact that conflict may have
18 had on the decision. The more egregious the evidence of conflict of interest is,
19 the less deference will be given to the fiduciary's decision. The level of
20 skepticism with which a court reviews a conflicted administrator's decision may
21 be low if a structural conflict is unaccompanied by evidence of malice, self-
22 dealing, or a "parsimonious claims-granting" history. On the other hand, a court
23 should weigh a conflict more heavily if the administrator gave inconsistent reasons
24 for a claim's denial, failed to adequately investigate or ask a claimant for
25 necessary evidence, failed to credit reliable evidence, or has a history of denials
26 due to incorrect interpretations of plan terms or decisions against the weight of
27 evidence in the record.

28 We begin our examination of Aetna's conflict of interest by noting that it

Charles J. Fleishman

1    is both the claims fiduciary, with the power to determine who gets benefits and
2    how much, and the entity that has to pay the benefits.  "[P]laintiff's will have the
3    benefit of an abuse of discretion review that always considers the inherent conflict
4    when a plan administrator is also the fiduciary, even in the absence of 'smoking
5    gun' evidence of conflict."  <u>Abatie</u>, 969.  Thus, even if there were no evidence of
6    Aetna's inherent conflict of interest affecting its decision, the court must apply a
7    modified, less deferential, abuse of discretion review in judging Aetna's
8    decision.

9         Applying the <u>Abatie</u> conflict of interest analysis to the present case produces
10   a plethora of facts that should effect the court's view of the situation.

11        First we have a denial of a full and fair review.  29 USC 1133(2).  Aetna
12   failed to send the plaintiff all of the surveillance videos until after the
13   administrative appeal was denied and refused to tell the plaintiff of its prior
14   connection with Dr. Krames.   Filed concurrently with this brief is the disc
15   represented by defendant to be the surveillance films of the plaintiff.

16        Second we have the defendant relying on the opinion of Dr. Marks, who
17   never met the plaintiff and whose opinion that walking, driving, shopping, talking,
18   walking a horse and riding a horse is per se evidence of no disability contradicts
19   the opinion of Dr. Krames, upon whose opinion Dr. Marks claims to rely.  See
20   <u>Salley v. DuPont</u> 966 F.2d 1011, 1015 (5th Cir. 1992) where the court held that
21   it was arbitrary and capricious to deny ERISA benefits based on the opinions of
22   non-examining doctors who contradicted the opinion of treating doctors when the
23   entire knowledge of the non-examining doctors regarding the patient came from
24   the records of the treating doctors.  In <u>Pinto v. Reliance Standard</u> 240 F.3d 840 (3d
25   Cir. 2000) the court held that the cherry picking of a treating doctor's findings and
26   the rejection of his pro-disability conclusion was evidence of conflict of interest
27   affecting the standard of review.  Further, in relying on Dr. Marks' opinion, Aetna
28   failed to come to terms with the fact that Marks' opinion is also based on the

1   plaintiff's performance on the FCE, a test that Aetna itself found to be "invalid."

2   Third, we have the defendant rejecting the opinions of treating doctors.  In

3   Donaho v. FMC 74 Fed.3d 894, 901 (8th Cir. 1996) the denial of benefits was

4   found to be arbitrary and capricious when the only evidence supporting the

5   decision was the report of a reviewing physician, who never examined the

6   claimant, where all of the treating doctors opined total disability.  "While this fact

7   alone is not dispositive, it lessens the weight which the committee should have

8   accorded [the reviewing doctor's] opinion. . . . Certainly where the reviewing

9   physician's conclusions are contradicted by an examining physician and two

10  treating physicians, reliance on the reviewing physician's conclusions 'seems

11  especially misplaced' and constitutes an abuse of discretion. . . . In prior cases, we

12  have held that where there is a conflict of opinion, the plan administrator does not

13  abuse his discretion in finding that the employee is not disabled.  However, where

14  the administrative decision lacks support in the record, or where the evidence in

15  support of the decision does not ring true and is so overwhelmed by contrary

16  evidence, the administrative decision is unreasonable and will not stand.  That is

17  the case here."

18  Next, Aetna ignored the decision to grant Ms. Chellino Social Security

19  benefits (Ladd v. ITT 148 F.3d 753 (7th Cir. 1998)), the plaintiff's cognitive

20  problems (Hines v. Unum 110 F.Supp.2d 458, 466 (W.D. Va 2000)), and her use

21  of narcotic analgesics (Smith v. Continental Casualty 450 F.3d 253, 264 (6th Cir.

22  2006)).  These facts tend to show that Aetna failed to credit the plaintiff's reliable

23  evidence, failed to follow ERISA regulations, and made a decision contrary to the

24  weight of the evidence.

25  Abatie, 969, describes the court's function when doing a conflict of interest

26  analysis as "something akin to a credibility determination about the insurance

27  company's or plan administrator's reason for denying coverage under a particular

28  plan and a particular set of medical records."  Plaintiff suggests that under the

Charles J. Fleishman

1    facts of this case, terminating the plaintiff's disability benefits had more to do with
2    Aetna's desire to save its money than Aetna's belief that she was able to work.
3    The termination of benefits was an abuse of discretion.

4        Even if there were no <u>Abatie</u> decision and this case were to be decided with
5    a pure arbitrary and capricious standard of review, the defendant should be found
6    to have abused its discretion.   The plaintiff's benefits were terminated because
7    Aetna claimed that she could perform a sedentary occupation.   There is no
8    evidence that the plaintiff can perform a sedentary occupation.   No doctor ever
9    opined that she could and if one did, he did so only by ignoring the definition of
10   the term "sedentary."   "Sedentary work involves lifting no more than 10 pounds
11   at a time and occasionally lifting or carrying articles like docket files, ledgers, and
12   small tools.   Although a sedentary job is defined as one which involves sitting, a
13   certain amount of walking and standing is often necessary in carrying out job
14   duties.   Jobs are sedentary if walking and standing are required occasionally and
15   other sedentary criteria are met."   20 CFR §404.1567(a).   Dr. Krames, in his
16   second report limited the plaintiff's ability to carry to 5 pounds.   There is no
17   evidence at all contradicting the opinion of the plaintiff's physical therapist that
18   she is limited to 15-20 minutes of sitting in a good seat where she is able to shift
19   and reposition and "Even with rest she can not total a functional amount of sitting
20   for work related activities and cannot sit an hour a day more than 2-3 days per
21   week." 229.   If the plaintiff cannot lift more than 5 pounds and if she cannot sit
22   for most of an eight hour work day, she cannot, by definition, perform sedentary
23   work.   A termination of benefits that is not supported by substantial evidence is
24   an abuse of discretion.   <u>Snow v. Standard</u> 87 F.3d 327 (9th Cir. 1996).

25
26
27
28

*Charles J. Fleishman*

## CONCLUSION

The plaintiff's benefit from the Plan is $2475 per month minus what she received per month initially for Social Security. Thus she is entitled to $1366.02 per month and a waiver of the premiums on her life insurance. She is entitled to recover all arrears owed plus interest and attorney fees.

Respectfully submitted,


Charles J. Fleishman