1  SEDGWICK, DETERT, MORAN & ARNOLD LLP
   REBECCA A. HULL  Bar No. 99802
2  One Market Plaza
   Steuart Tower, 8th Floor
3  San Francisco, California 94105
   Telephone: (415) 781-7900
4  Facsimile: (415) 781-2635

5  Attorneys for Defendants
   Kaiser Foundation Health Plan, Inc., and Kaiser
6  Permanente Welfare Benefit Plan

7

8                          UNITED STATES DISTRICT COURT

9                         NORTHERN DISTRICT OF CALIFORNIA

10

11  MARIE CHELLINO,                          CASE NO. C 07-03019 CRB

12          Plaintiff,                       **DEFENDANTS' MOTION FOR
                                             SUMMARY JUDGMENT AND
13      v.                                   SUPPORTING MEMORANDUM OF
                                             POINTS AND AUTHORITIES**
14  KAISER FOUNDATION HEALTH
    PLAN, INC., AND DOES 1-10,               **DATE: MARCH 28, 2008**
15
            Defendant.                       **TIME: 10:00 A.M.**
16
                                             **DEPT: 8**
17

18

19

20

21

22

23

24

25

26

27

28

                                                          CASE NO. C 07-03019 CRB
                          DEFENDANTS' OPENING MSJ BRIEF

# TABLE OF CONTENTS

**PAGE**

A.  Introduction..................................................................................................................2

I.  FACTUAL / LEGAL ANALYSIS .......................................................................................3

A.  The Plan's Express Grant of Discretion .....................................................................3

B.  LTD Benefits Under the Plan .....................................................................................4

C.  Factual Summary .........................................................................................................4

    1.  Plaintiff's Background and LTD Claim..........................................................4

    2.  Termination of LTD Benefits Effective June 19, 2006 ..................................5

    3.  Plaintiff's Appeal...........................................................................................9

II.  LEGAL ANALYSIS AND ARGUMENT .........................................................................10

A.  Abuse of Discretion Review Applies .......................................................................10

B.  The Determination Should be Afforded a High Degree of Deference ..................11

C.  Aetna Was Entitled to Credit the Opinions of the IME Physician and the Reviewing Rheumatologist in Deciding Plaintiff's Ongoing Claim ..............13

D.  Past Receipt of Plan Benefits Does Not Require Continued Payment ..................18

E.  Receipt of SSDI Benefits Is Not Determinative of Plan Benefits ..........................19

III.  CONCLUSION................................................................................................................20

DEFENDANTS' OPENING MSJ BRIEF

# TABLE OF AUTHORITIES

**PAGE**

## Cases

*Abatie v. Alta Health & Life Ins. Co.*,
458 F.3d 955 (9th Cir. 2006) ..............................................................................................10, 11

*Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999) ..............................................10

*Black & Decker Disability Plan v. Nord*
538 U.S. 822, 834, 123 S. Ct. 1965 (2003) ...............................................................13, 17, 20

*Boardman v. Prudential Ins. Co. of Am.*,
337 F.3d 9, 17 n.5 (1st Cir. 2003) ...........................................................................................19

*Crume v. Metropolitan Life Ins. Co.*,
417 F. Supp. 2d 1258 (M.D. Fla. 2006)...................................................................................15

*Davis v. Unum Life Ins. Co. of America,*
444 F.3d 569 (7th Cir. 2006)...................................................................................................17

*Donato v. Metro. Life Ins. Co.*,
19 F.3d 375, 380 (7th Cir. 1994)..............................................................................................13

*Ellis v. Liberty Life Assur. Co. of Boston*,
394 F. 3d 262 (5th Cir. 2004)..................................................................................................18

*Firestone Tire & Rubber Co. v. Bruc*
89 U.S. 101, 198 S.Ct. 948 (1989)..........................................................................................11

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*,
370 F.3d 869 (9th Cir. 2003)......................................................................................14, 16, 18

*Lake v. Hartford Life and Acc. Ins. Co.*,
320 F.Supp.2d 1240 (M.D. Fla. 2004)......................................................................................17

*Leipzig v. AIG Life Ins. Co.*,
362 F.3d 406, 409 (7th Cir. 2004)...........................................................................................14

*Madden v. ITT Long Term Disability Plan*,
914 F.2d 1279, 1285 (9th Cir. 1990).......................................................................................20

*Maniatty v. UNUMProvident Corp.*,
218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002)..............................................................................15

*Maynard v. City of San Jose*,
37 F.3d 1396, 1404 (9th Cir. 1994).........................................................................................13

*Miller v. Metropolitan Life Ins. Co.*,
925 F.2d 979 (6th Cir. 1991)...................................................................................................18

*Oster v. Barco of Cal. Employees Retirement Plan*
869 F.2d 1215, 1218 (9th Cir. 1998)........................................................................................13

**Table of Authorities**
**(Continued)**

**PAGE**

*Semien v. Life Ins. Co. of North America,*
9 436 F.3d 805 (7th Cir. 2006) ....................................................................................... 13, 14, 16

*Sweatman v. Commercial Union Ins. Co.,*
39 F.3d 594, 602 (5th Cir. 1994) ............................................................................................. 13

*Taft v. Equitable Life Assur. Soc'y,*
9 F.3d 1469, 1473 (9th Cir. 1993) ........................................................................................... 10

**Statutes**

29 C.F.R. § 2560 ....................................................................................................................... 16

29 U.S.C. § 1001 ................................................................................................................... 2, 4

1  **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2     **PLEASE TAKE NOTICE** that on March 28, 2008, at 10:00 a.m., or as soon thereafter

3  as the matter may be heard, in Courtroom 8 of this Court before the Charles R. Breyer, located at

4  450 Golden Gate Avenue, 17th Floor, San Francisco, California 94102, defendants Kaiser

5  Foundation Health Plan, Inc. ("KFHP"), and Kaiser Permanente Welfare Benefit Plan ("Plan")

6  will and hereby do move for summary judgment on plaintiff Marie Chellino's claim for long

7  term disability ("LTD") benefits under the Employee Retirement Income Security Act

8  ("ERISA"), 29 U.S.C. section 1001, *et seq*.

9     This motion is made on grounds that the Plan's claim administrator did not abuse its

10  discretion when it determined that plaintiff no longer was eligible for Plan benefits, and that

11  determination is entitled to a high degree of deference under the circumstances. As such, the

12  Plan and KFHP are entitled to summary judgment.

13     This motion is based on this notice of motion and motion, the accompanying

14  memorandum of points and authorities, the administrative record lodged herewith, the

15  Declaration of Richard Collins filed herewith, the pleadings and other documents on file in this

16  action, and on such other and further matters as may be presented to the Court at or prior to the

17  hearing.

18  Dated: February 22, 2008          SEDGWICK, DETERT, MORAN & ARNOLD LLP

19

20                                      By _____

21                                          Rebecca A. Hull, Attorneys for Defendants

22

23

24

25

26

27

28

-1-                                    CASE NO. C 07-03019 CRB

# MEMORANDUM OF POINTS AND AUTHORITIES

## A.    Introduction

Defendants Kaiser Foundation Health Plan, Inc. ("KFHP"), and Kaiser Permanente Welfare Benefit Plan (the "Plan") move for summary judgment on the claims brought by plaintiff Marie Chellino under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*.

Plaintiff seeks past and future long term disability ("LTD") benefits under the Plan based on allegedly disabling fibromyalgia and myofascitis. The benefits at issue initially were funded through a group policy of insurance issued by New York Life Insurance Company ("NYL"), which initially was the claim administrator. As of June 30, 1999, benefits were funded by Aetna Life Insurance Company ("Aetna"), which also became the claim administrator at that time. At all relevant times, the Plan Administrator was KFHP.

Plaintiff's claim initially was approved under the Plan's "own occupation" disability definition. Benefits were briefly terminated by NYL effective December 31, 1998, when the disability definition changed to "any occupation," but were reinstated by Aetna after plaintiff submitted additional medical information.

Benefits again were terminated effective August 16, 2006, after (1) plaintiff was observed in surveillance videos over a period of 13 months (between May 2004 and June 2005) driving, shopping, carrying objects, walking, bending, pulling horses, mounting horses, and riding horses without exhibiting pain behaviors; (2) an Independent Medical Examination ("IME") physician opined, after physically examining plaintiff and reviewing her medical records, as well as the surveillance tapes, that she was not substantially limited in her activities and that she was capable of being employed in a sedentary job; and (3) a labor market survey identified suitable available jobs that she was capable of performing. The termination of benefits was upheld on appeal, after an independent, Board-certified rheumatologist opined that (1) the surveillance videos materially contradicted plaintiff's subjective reports of disability, (2) her treating physician's statements regarding alleged disability were internally inconsistent, and (3) the IME physician had accurately assessed plaintiff's actual functional capabilities.

1    Plaintiff's suit challenges the propriety of the termination of benefits in 2006. Aetna did

2   not abuse its discretion in terminating benefits, and no further benefits are owed by the Plan.

### I.    FACTUAL / LEGAL ANALYSIS

4    Plaintiff was last employed with Kaiser Foundation Hospitals ("KFH") as a programmer

5   analyst. She last worked June 26, 1996, and filed a claim for LTD benefits alleging she was

6   disabled from working by fibromyalgia and myofascitis.

7    Plaintiff received benefits for a period of time, but benefits were terminated effective

8   August 16, 2006, after multiple surveillance videos over an extended period of time, together

9   with an IME and a labor market survey, established that she no longer was disabled under the

10   Plan's "any occupation" disability definition. The issue on this motion is whether Aetna abused

11   its discretion in determining that plaintiff was no longer eligible under the Plan's terms.

### A.    The Plan's Express Grant of Discretion

13    The umbrella plan document, entitled "Kaiser Permanente Welfare Benefits Plan,"

14   conclusively demonstrates that the Plan confers discretion on Aetna. (ADMIN 909.)[1]  It states:

15    4.1    Named Fiduciaries. The named fiduciaries with respect to
     each Plan, for purposes of ERISA, shall be the Employers whose
16    employees participate in such Plan. With respect to each **Program
     in which benefits are provided under a Contract in which the**
17    **Insurer is responsible for review of the benefit claim
     determination,** such Insurer is the named fiduciary with respect to
18    such determinations, pursuant to ERISA Regulation § 2560.503-
     1(g)(2). . . .
19
     4.2    Allocation and Delegation of Fiduciary Responsibility.
20
     a.    Each Named Fiduciary is allocated fiduciary responsibility
21    with respect to the specific discretionary authority exercised by it,
     under the **Contract(s) relating to the Program(s) in which such
22    Named Fiduciary participates.** . . .

23    4.4    Discretionary Authority of Fiduciaries.    Each Named
     Fiduciary . . . shall have full and complete authority with respect to
24    its responsibilities under the Plan **and any Program hereunder.**
     All actions, interpretations, and decisions of a Named Fiduciary . . .
25    shall be conclusive and binding on all persons and shall be given
     the maximum possible deference allowed by law.
26

27    [1] The referenced excerpts of the Administrative Record pertaining to plaintiff's claim are
     designated by the prefix "ADMIN" followed by the page number(s); the complete administrative
28   record is Exhibit A to the Declaration of Richard Collins, filed herewith.

1  (ADMIN 909 [emphasis added]) The umbrella plan document, at Appendix A (ADMIN 914)

2  identifies "New York Life Insurance Company Contract G-12250" as one of the Programs under

3  the Plan, as to which Aetna Life Insurance Company is the successor (*see* Declaration of Richard

4  Collins, filed herewith, at paragraph 3.)

## B.    **LTD Benefits Under the Plan**

6  The Plan which is an employee welfare benefit plan organized under and governed by the

7  Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq. At all relevant

8  times, KFHP was the Plan Administrator, and Aetna was the claim administrator.

9  The Plan defines "disability" for purposes of eligibility for LTD benefits as follows:

10  • You are considered totally disabled if, during the first 24 months of your disability,
you are continuously unable to perform any and every duty pertaining to your
11  occupation.

12  • After your disability continues for 24 months, you are considered totally disabled if
you are continuously unable to engage in any and every occupation for compensation
13  or profit for which you are reasonably qualified by education, training or experience.

14  (ADMIN 0957.) LTD benefits may end for a variety of reasons – for instance, if the participant

15  no longer meets the Plan definition of disability, or the participant reaches the maximum benefit

16  duration. (ADMIN 956.)

17  The Plan documents set forth procedures for making benefit claims, including procedures

18  for the submission of claims, determinations approving or denying claims, review of claims that

19  have been denied in whole or in part, and information regarding a participant's rights under

20  ERISA. (ADMIN 903-14, 992-97.)

21  The Plan documents expressly delegate discretionary authority to Aetna, as the Plan's

22  insurer and claim fiduciary, to construe and interpret the Plan's terms, and to approve or deny

23  claims for benefits under the Plan. (ADMIN 909-10.)

## C.    **Factual Summary**

25  1.    Plaintiff's Background and LTD Claim

26  Plaintiff participated in the Plan through her employment with KFH as a programmer

27  analyst, although prior to her employment at KFH she had earned a pharmaceutical degree in

28  1978 and a master's degree in public health in 1986, and had held jobs as a pharmacist, research

-4-                                           CASE NO. C 07-03019 CRB

1  assistant, and programmer analyst/biostatistician. (ADMIN 27.) She started employment at KFH

2  in April 1991 and last worked June 26, 1996. Her treating doctor, David Padgett, D.O., filed an

3  Attending Physician Statement ("APS") in support of her LTD claim under the Plan, in which he

4  diagnosed her with fibromyalgia and myofascitis and stated that her functional capacity was

5  severely limited, that she was incapable of sedentary work, and that no return to work was

6  expected. (ADMIN 595-621; *see* ADMIN 673-74.)

7           2.       Termination of LTD Benefits Effective June 19, 2006

8  Plaintiff received Plan benefits for a period of time, initially under the Plan's "own

9  occupation" disability definition, and then under the "any occupation" definition after the first

10 two years. (*See* ADMIN 624-28.) During a periodic review of plaintiff's current medical

11 records, a nurse consultant noted that Dr. Padgett's records reflected that plaintiff was improving;

12 the nurse consultant therefore suggested a physician review for file direction. (ADMIN 760-61.)

13 Plaintiff's records were reviewed by a consulting clinical neuropsychologist, who issued a

14 report dated December 31, 2002, finding that plaintiff's perceived degree of impairment was

15 greater than what the objective medical data would support. (ADMIN 743-44.) Among other

16 things, the neuropsychologist observed that conspicuously absent from plaintiff's medical

17 records was any structured pain management plan or comprehensive psychosocial assessment,

18 and the records also did not include an adequately articulated program, goals, or time frame for

19 intervention. (*Id.*)

20 On June 23, 2003, Aetna sent a letter to plaintiff asking her to provide updated medical

21 records. (ADMIN 741-42.) Dr. Padgett submitted another APS dated August 5, 2003, again

22 diagnosing plaintiff with fibromyalgia and myofascitis and opining that she had no ability to

23 work, but also noting that her condition was slowly improving. (ADMIN 43-46.) Dr. Padgett

24 submitted a further APS on February 17, 2004, again reporting that plaintiff's condition was

25 improving. (ADMIN 59-61.) In an Aetna diary note of April 20, 2004, a medical reviewer noted

26 that plaintiff appeared invested in being ill and that her physicians were supporting her in this,

27 but remarked that there seemed to be no structured program to return plaintiff to health. The

28 reviewer suggested that it could be informative to conduct surveillance to see whether plaintiff

1   was more active than she had reported. (ADMIN 1246-48.)

2       Periodic surveillance began on May 11, 12 and 15, 2004. The results from this initial
3   period were summarized in a report dated May 19, 2004, and were reflected in an Aetna diary
4   note dated May 26, 2004. (ADMIN 17-26, 1253.) During this period, plaintiff was observed
5   driving, shopping, walking around her neighborhood, and going to an equestrian center where
6   she was observed walking and also riding horses. (*Id.*)

7       On July 22, 2004, Aetna sent a copy of the surveillance videos to Dr. Padgett, the treating
8   physician, pointing out that it appeared plaintiff's condition had improved and that she would
9   have at least a sedentary work capacity. (ADMIN 211.) Aetna told Dr. Padgett that if he
10  disagreed, he should provide the basis for his opinion and also provide any objective data that
11  supported it. (*Id.*)

12      Dr. Padgett responded in a letter dated September 27, 2004, agreeing that plaintiff's
13  condition had "tremendously improved" but also saying that she was not yet at a point where she
14  would be able to work. (ADMIN 295; *see* ADMIN 311.) He said that he encouraged plaintiff to
15  ride horses, saying that "the rhythmic motions were good for spinal strengthening and stability."
16  He also commented that the surveillance video did not show that (according to plaintiff's self-
17  report) she allegedly took rest breaks, spent time lying down in the midst of such activities, and
18  used wrist braces and a sacroiliac belt while performing such activities. Accepting her self-
19  reports of such alleged restrictions, Dr. Padgett supported her claimed inability to work. (*Id.*)

20      On December 15, 2004, Aetna sent another letter to plaintiff, again asking her to provide
21  updated medical information. (ADMIN 218.) On February 10, 2005, Dr. Padgett sent updated
22  records to Aetna. (ADMIN 223-34.) The updated file was reviewed by a nurse consultant on
23  March 9, 2005, resulting in Aetna's request for an independent medical examination ("IME"),
24  on March 29, 2005. (ADMIN 1291.)

25      Further surveillance took place on April 17-19, 2005, and the results were summarized in
26  a report dated April 20, 2005, and reflected in an Aetna diary note dated May 26, 2005. (ADMIN
27  1-16, 1294.) On those dates, plaintiff was observed driving, carrying objects, leading horses, and
28  walking for extended periods (sometimes wearing a neck brace, and sometimes not). (*Id.*)

1       An IME and records review were conducted on June 12, 2005, by Elliot S. Krames, M.D.,

2 Medical Director, Pacific Pain Treatment Centers, reflected in a report of June 22, 2005.

3 (ADMIN 326-40.) Dr. Krames reported that he had analyzed plaintiff's MRI, and found that the

4 MRI did not support her claim of total disability. He further reported that all physical findings

5 were essentially negative, other than her give-way weakness and subjective trigger points, and

6 tender points. (*Id.*) Dr. Krames found no objective documentation sufficient to support the

7 claimed work restrictions, but because of her self-reported symptoms, her claimed inability to

8 perform activities of daily living, and her diagnosis of fibromyalgia, he did not dispute her

9 asserted inability to compete in the labor market for any occupation. Dr. Krames rated plaintiff's

10 functional capacity as 100% disabled, based on her self-reports, and said that he did not see a

11 likelihood of major change. (*Id.*)

12       Aetna also referred the file for in-house review by Medical Director Rick Snyder, D.O.,

13 M.P.H. In a report dated July 12, 2005, Dr. Snyder noted that the actual physical examination

14 findings at the IME did not support the claim that plaintiff was incapable of sedentary work, and

15 suggested further surveillance, an activities check and/or a functional capacities evaluation. In a

16 diary note dated July 14, 2005, Dr. Snyder added a note that the IME physician, Dr. Krames,

17 should be given the opportunity to review the surveillance tapes (that is, a chance to allow him to

18 compare them to his own examination and to the history and self-reports he had obtained from

19 plaintiff), to see whether observing plaintiff in her actual daily activities was consistent with what

20 he had been told. (ADMIN 1306-17.)

21       Aetna sent the surveillance tapes to Dr. Krames for review and comment. (ADMIN 410.)

22 Dr. Krames issued a supplemental report dated February 15, 2006, stating that what he saw in the

23 tapes was markedly different from plaintiff's representations to him regarding her condition

24 during the examination and history in June 2005. (ADMIN 444-49.) He noted in particular that

25 in almost all of the footage, plaintiff was recorded walking without antalgic gait, and without any

26 degree of pain behavior. He observed that he could see her using her hands at will, pulling

27 horses, lifting herself onto a horse without difficulty and without any degree of pain behavior,

28 bending at the waist, turning left and right, turning her neck left and right without any painful

1 expressions, and holding objects that appeared to be more than two pounds with both arms but
2 without having to hold them against her chest (as she had claimed was necessary, when Dr.
3 Krames examined her and took her history in June 2005). Dr. Krames concluded, based on all of
4 the behaviors and physical activities captured on the tapes, that plaintiff was not severely limited
5 in what she could do, and also that she could work in an occupation that called for her to do fine
6 manipulation and hold objects weighing up to five pounds. (*Id.*)

7 On receipt of Dr. Krames' supplemental report, Dr. Snyder issued a report dated March
8 13, 2006, stating that he concurred with Dr. Krames' opinion as to what the surveillance
9 demonstrated about plaintiff's physical abilities. (ADMIN 459-60.) Dr. Snyder then
10 recommended further assessment of plaintiff's capabilities, including a two-day Functional
11 Capacities Evaluation ("FCE") including validity testing. (*Id.*)

12 A two-day FCE therefore was scheduled with Danielle Barzoloski, P.T., of Unival on
13 April 26-27, 2006. (ADMIN 464.) In a report dated May 2, 2006, the physical therapist noted
14 that plaintiff participated in only 15 of 27 sub-tests, and would lie down frequently. (ADMIN
15 847-57.) The physical therapist reported that plaintiff's performance was self-limited, and that
16 the evaluation therefore was limited to the level of what plaintiff was willing to do, rather than
17 evaluating safe maximum activity levels. The physical therapist's report concluded that it was
18 impossible to accurately assess plaintiff's abilities, because of her self-limiting behavior in the
19 examination. A medical reviewer analyzed the physical therapist's report, and concluded on May
20 25, 2006, that the FCE was invalid as a measure of plaintiff's actual functional abilities (*i.e.*, her
21 failure or refusal to attempt to participate in many of the activities as directed by the physical
22 therapist was not valid as evidence that, in fact, she was unable to do so, as she claimed).

23 Aetna then performed a labor market survey on July 5-6, 2006, which identified several
24 existing and available jobs that plaintiff would be able to perform within the limitations that were
25 set out in Dr. Krames' supplemental IME report. (ADMIN 487-512.)

26 On August 31, 2006, Aetna issued a letter notifying plaintiff that Plan benefits were being
27 terminated effective August 16, 2006. (ADMIN 841-45.) The letter explained that the
28 termination of benefits was based on file reviews by Aetna's medical consultants, surveillance

1  videos and reports, Dr. Krames' IME and reports, the FCE that had yielded an invalid result
2  because she was not fully participating, and the labor market survey identifying jobs she could
3  perform. Plaintiff was also notified of her right to appeal the termination of benefits. (ADMIN
4  *Id.*)

5          3.    Plaintiff's Appeal

6        Plaintiff's attorney requested documents in connection with a planned appeal, on
7  September 5, 2006. (ADMIN 526-27.) On September 19, 2006, Aetna supplied the requested
8  documents. (ADMIN 531.) A different attorney sent a letter to Aetna dated November 14, 2006,
9  in pursuit of plaintiff's appeal of the termination of Plan benefits and seeking duplicative
10  documents. (ADMIN 532.) Plaintiff's attorney again wrote to Aetna on January 22, 2007,
11  enclosing medical reports from Rajiv Dixit, M.D., dated November 28, 2006, and January 15,
12  2007. (ADMIN 545-49.) He wrote again on January 31, enclosing additional records and a
13  journal article. (ADMIN 555-94.)

14        Aetna then submitted plaintiff's complete file, as supplemented by her attorney, for
15  review by an independent physician consultant, Alan Marks, M.D., who is Board-certified in
16  internal medicine and in rheumatology. (ADMIN 900-02.) In his report dated February 19,
17  2007, Dr. Marks concluded that plaintiff's sub-optimal responses during the FCE indicated that
18  her motivation was to continue to receive LTD benefits. Dr. Marks further observed that the
19  surveillance videos clearly contradicted plaintiff's extreme subjective reports of disability, but in
20  fact showed a woman who was leading a fairly normal day-to-day lifestyle, specifically noting
21  that the surveillance was inconsistent with plaintiff's subjective complaints and asserted
22  limitations. (*Id.*)

23        Dr. Marks particularly found Dr. Krames' IME instructive, because Dr. Krames' initial
24  report (based on plaintiff's self-reported symptoms) agreed that she could not work (although
25  clearly stating that this was not based on objective abnormalities, but only on plaintiff's self-
26  report). As Dr. Marks commented, however, upon reviewing the surveillance showing plaintiff's
27  actual activity levels and abilities, Dr. Krames changed his conclusion completely, reversing
28  himself as to work ability. Dr. Marks reported that his own view mirrored Dr. Krames' ultimate

1    finding, further observing that the treating doctor repeatedly noted how much plaintiff improved,
2    yet continued to accept her self-report of pain as being at exactly the same level as before, that is,
3    8-9 on a scale of 1-10, with the treating doctor's notes merely reflecting what she had said – that
4    she supposedly cannot work because of extreme pain. Dr. Marks further pointed out that the
5    treating doctor did not document, by examination, x-rays or testing, objectified musculoskeletal
6    or neuromuscular abnormalities that would impair plaintiff from working. (ADMIN *Id*.)

7        Aetna then issued a letter dated February 27, 2007, upholding the decision to terminate
8    Plan benefits for the reasons stated in the original termination letter and also based on Dr. Marks'
9    report. (ADMIN 1497-1519.) This lawsuit followed.

10                    **II.    LEGAL ANALYSIS AND ARGUMENT**

11        The Plan explicitly grants discretion to Aetna with regard to the type of decision in issue
12    here. When a fiduciary's claim decision is reviewed for abuse of discretion, "a motion for
13    summary judgment is merely the conduit to bring the legal question before the district court and
14    the usual tests of summary judgment, such as whether a genuine dispute of material fact exists,
15    do not apply." (*Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999.) A court is not
16    permitted to substitute its judgment for that of the fiduciary, unless the decision was clearly
17    erroneous in light of the available record, or there was no reasonable basis for it. (*Id.* at 944.)

18        As discussed below, the appropriate standard of review in this Court is abuse of
19    discretion. Where, as here, there is relevant evidence "that reasonable minds might accept as
20    adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from
21    the evidence, the decision must be upheld" on review. *Taft v. Equitable Life Assur. Soc'y*, 9 F.3d
22    1469, 1473 (9th Cir. 1993). On the evidence, Aetna did not abuse its discretion in terminating
23    Plan benefits and its decision is entitled to substantial deference. Indeed, fiduciary obligations to
24    other participants and beneficiaries would be violated if benefits continued to be paid to a person
25    who no longer was eligible for them.

26            **A.    Abuse of Discretion Review Applies**

27        The Ninth Circuit opinion in *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir.
28    2006) (en banc) is instructive on the issue of what standard of review applies to this action.

1 *Abatie* interprets U.S. Supreme Court's opinion in *Firestone Tire & Rubber Co. v. Bruch*, 489
2 U.S. 101, 198 S.Ct. 948 (1989). In determining the standard of review, the starting point in all
3 cases is the plan language. *Firestone*, 489 U.S. at 111. If an ERISA plan confers discretionary
4 authority to determine eligibility for benefits, the court must review the administrator's denial of
5 benefits under a deferential "abuse of discretion" standard of review. *Id.* at 115. Conversely, if
6 the plan does not confer discretion, the appropriate standard of review is *de novo*. *Id. Abatie*
7 interprets the Supreme Court's *Firestone* opinion as follows: "*Firestone* appears to provide for
8 only two alternatives. When a plan confers discretion, abuse of discretion review applies; when
9 it does not, *de novo* review applies." *Id.* at 965 (citing *Firestone,* 489 U.S. at 115).

10       Here, the Plan documents state that with respect to benefits in which an insurer is
11 responsible for review of benefit claim determinations, the insurer is the named fiduciary for
12 purposes of such determinations. (ADMIN 909.) The Plan documents expressly confer
13 complete discretionary authority on the Plan fiduciaries, including "discretionary authority to
14 construe and interpret each and every document setting forth the applicable terms of a Plan," and
15 "the discretionary authority to approve or deny claims for benefits under such Plan." (ADMIN
16 909-10.) Under *Firestone* and *Abatie*, this matter should be reviewed for abuse of discretion.

17       **B.    The Determination Should be Afforded a High Degree of Deference**

18       In *Abatie*, the Ninth Circuit held that where the Plan confers discretion, a trial court is to
19 determine how much deference to afford the Plan's determination. "A district court, when faced
20 with all the facts and circumstances, must decide in each case how much or how little to credit
21 the plan administrator's reason for denying insurance coverage." *Id.* at 968. "When an
22 administrator can show that it has engaged in an 'ongoing, good faith exchange of information
23 between the administrator and the claimant,' the court should give the administrator's decision
24 broad deference …." *Id.* at 972.

25       Aetna's determination will be afforded a high degree of deference. Although Aetna both
26 insures the benefits at issue, and also made the benefit determinations at issue in its capacity as
27 claim administrator, the procedure and manner in which plaintiff's claim was handled undercuts
28

1   any argument by plaintiff that the decision was improperly motivated.[2] Aetna paid LTD benefits
2   to plaintiff throughout the lengthy period (nearly three years) during which it investigated her
3   claim of functional impairment. Aetna conferred with her own and independent physicians.
4   Aetna conducted surveillance, not for just a few hours of a single day, but on more than one
5   occasion, and on each occasion for multiple days.  Aetna reviewed the file not once, but several
6   times before concluding that plaintiff was not eligible for further Plan benefits. This approach to
7   the issue belies an argument that Aetna was motivated to deny her claim based on a structural
8   conflict.[3]

9           The administrative record reflects that Aetna fully complied with ERISA regulations, and
10  that it took comprehensive steps in seeking to determine accurately the level of plaintiff's actual
11  functional capacity. Aetna obtained all available records from her treating physicians, conducted
12  several days of surveillance on separate occasions, sought feedback from her physicians about the
13  results of the surveillance (which were shared with her physicians), sent her for an IME and an
14  FCE, permitted the IME physician to review the surveillance tapes to determine whether they
15  corroborated (or, as it transpired, undercut) plaintiff's self-reported symptoms and limitations,
16  performed a labor market survey to identify actual jobs plaintiff could perform, and had her files
17  reviewed by several doctors, including an independent, Board-certified rheumatologist.

18          In terminating benefits, Aetna credited the opinions of two independent physicians – the
19  IME doctor and the reviewing rheumatologist – each of whom had separately found that on the
20  evidence, including the behaviors observed in the surveillance videos, plaintiff had overstated her
21  claimed limitations and was not functionally impaired from sedentary work. Aetna also obtained
22  a labor market survey, which confirmed that multiple sedentary jobs suited to her minimal
23  restrictions were available. As such, Aetna unquestionably engaged in an ongoing, good faith

24

25  _____
    [2] Indeed, if saving money on claims was Aetna's overriding motivation, as plaintiff contends,
    Aetna would not have reinstated her benefits after the initial termination at test change in 1998,
26  at the very time when it was becoming financially responsible for the claim.
    [3] *See Ellis v. Liberty Life Assur. Co. of Boston,* 394 F. 3d 262, 272 n.23 (2004): "Although
27  Ellis may urge that Liberty made its decision in bad faith, the fact that Liberty initially granted
    her LTD benefits under the Policy supports a finding of good faith on Liberty's part."
28

1  exchange of information, and its determination must receive a high degree of deference under the
2  circumstances.

### C. Aetna Was Entitled to Credit the Opinions of the IME Physician and the Reviewing Rheumatologist in Deciding Plaintiff's Ongoing Claim

5  Aetna's termination of Plan benefits was not an abuse of the discretion granted to it by
6  the Plan. The Ninth Circuit has established the parameters of the abuse of discretion standard in
7  ERISA cases. *Oster v. Barco of Cal. Employees Retirement Plan*, 869 F.2d 1215, 1218 (9th Cir.
8  1998) held that a court will not interfere with a plan fiduciary's decision-making process unless
9  the decision is so "patently arbitrary and unreasonable as to lack foundation in factual basis
10 and/or authority in governing case or statute law." The court further held that it would be
11 improper to substitute its judgment for the judgment of the fiduciary, unless "the actions of the
12 [fiduciary] are not grounded on 'any reasonable basis'." *Id.* Similarly, a fiduciary's decision will
13 not be overturned if evidence exists that a reasonable mind might accept as adequate to support
14 the decision, even if it is possible to draw two inconsistent conclusions from the evidence.
15 *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994).   When the determination of a
16 disability claim simply comes down to a permissible choice between the position of an
17 administrator's independent medical consultant and a treating physician, an administrator does
18 not abuse its discretion by relying on the consultant. *See Sweatman v. Commercial Union Ins.*
19 *Co.*, 39 F.3d 594, 602 (5th Cir. 1994) (citing *Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 380
20 (7th Cir. 1994).

21 Here, Aetna's determination unquestionably is rationally based on the administrative
22 record, including the multiple surveillance videos and the findings of Dr. Krames and Dr. Marks.
23 Aetna was entitled to credit their opinions rather than inconsistent and conclusory assertions of
24 plaintiff and her doctor. See *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.
25 Ct. 1965 (2003). As discussed in *Semien v. Life Ins. Co. of North America,* 436 F.3d 805 (7th
26 Cir. 2006):

27          The reports by the physicians LINA hired to review Semien's claim
            demonstrate a thorough consideration of the available information.
28          These physicians found Semien capable of activities that would
            disqualify her from long-term disability coverage. Although

-13-                                    CASE NO. C 07-03019 CRB

> Semien's treating physicians reached different conclusions as to her abilities, under an arbitrary and capricious review, neither this Court, nor the district court, will attempt to make a determination between competing expert opinions. Instead, an "insurer's decision prevails if it has rational support in the record."

*Id.* at 812 (quoting *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004)).

Plaintiff's position, at bottom, amounts to no more than an argument that Aetna should have accepted the *ipse dixit* of her treating physician.

In a similar case involving a claim for disability benefits based on fibromyalgia that was alleged to be totally disabling, the Ninth Circuit rejected this position. In *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869 (9th Cir. 2003), the Court emphasized that fibromyalgia is one of many recognized medical conditions that "do not necessarily prevent people from working." *Id.* at 880. Thus, a diagnosis of fibromyalgia "does not by itself establish a disability." *Id.* It is the contractually designated function of the claim administrator to determine whether the condition is "disabling in a particular case" by evaluating whether a given claimant has provided "evidence that the fibromyalgia she suffered from disabled her from working at her job." *Id.* at 877, 880. The *Jordan* court also held that a claim administrator need not take a treating doctor's conclusory statement of disability at face value, where other doctors disagree or supporting evidence is lacking:

> Somebody has to make a judgment as to whether a medical condition prevents a person from doing her work, and the governing instrument assigns the discretion to the claims administrator. With a condition such as fibromyalgia, where the applicant's physicians depend entirely on the patient's pain reports for their diagnosis, their *ipse dixit* cannot be unchallengeable. That would shift the discretion from the administrator, as the plan requires, to the physicians chosen by the applicant.... It is not for an appellate court to decide that fibromyalgia should be treated by ERISA [claim] administrators as disabling in a given case. That is a medical and administrative judgment committed to the discretion of the [claim] administrator based on a fair review of the evidence.

*Jordan*, 370 F.3d at 878, 880.

Defendants do not dispute that plaintiff has had certain medical conditions. However, the

1   bare fact that a Plan participant has health issues does not establish eligibility for benefits under
2   the Plan. Rather, a participant's medical condition must cause functional impairments sufficient
3   to render her "Disabled" under the Plan and, as noted above, when the participant no longer
4   meets the Plan's definition of "disability," there is no further eligibility for Plan benefits. Here,
5   the medical evidence submitted by plaintiff, her physicians and her attorneys failed to establish
6   that she was functionally impaired from performing any occupation as of the date of termination
7   of benefits and, as a result, she did not meet the Plan's definition of disability and was not
8   entitled to benefits under the Plan as of that date. *See also Maniatty v. UNUMProvident Corp.*,
9   218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002) [emphasis added], rejecting a contention that a plan's
10  demand for objective evidence of disability was improper: " [I]t was not unreasonable for the
11  administrator to conclude that the only material reason the treating physicians were reaching their
12  diagnoses was based on their acceptance of plaintiff's subjective complaints: *an acceptance*
13  *more or less required of treating physicians, but by no means required of the administrator*."

14       Here, plaintiff's doctor reported her continuing improvement (and at one point
15  characterized that improvement as being tremendous), yet simultaneously reported (without
16  critical analysis) her unchanging self-assessment of supposed inability to work. Even when
17  confronted with evidence of his patient's actual activities, he attempted to rationalize and explain
18  away the documentation by means of her self-reports of alleged off-camera activity. In these
19  circumstances, it was not an abuse of discretion to credit the reviewing doctors' opinions of the
20  medical significance of the activities that were recorded in the course of the surveillance. Her
21  doctor's credulous reporting of claimed symptoms and limitations, despite his own observation
22  of improvement, does not establish even the existence, much less the degree, of a functional
23  incapacity plaintiff supposedly was experiencing. Rejection of an unsupported conclusion is not
24  improper. *See Crume v. Metropolitan Life Ins. Co.*, 417 F. Supp. 2d 1258 (M.D. Fla. 2006),
25  where the plaintiff challenged denial of a claim that she was disabled by bipolar disorder. Her
26  records were reviewed by psychiatrists who opined that they did not substantiate an impairment
27  causing a functional limitation precluding her from working. *Id.* at 1262-63, 1266-68. The court
28  further held that the claim administrator, in crediting the reviewing doctors' opinions, did not

1  thereby arbitrarily refuse to consider a treating physician's diagnosis:

2            First, [the treating doctor's] bipolar disorder diagnosis did not
             constitute "reliable evidence"; **there was no objective support for**
3            **that diagnosis**. Second, it is abundantly clear that MetLife did
             **consider** Dr. Berns' diagnosis, but rejected it. It was within
4            MetLife's province to do so.

5  *Id.* at 1276 (emphasis added).

6         Plaintiff contends that Aetna was not entitled to rely on the review of an independent

7  outside medical reviewer or that of the IME examiner, apparently because of the totally

8  unremarkable fact that they were paid for their work. ERISA regulations *require independent*

9  *record reviews*. *See* 29 C.F.R. § 2560-503-1(h)(3)(iii), (4). It is axiomatic that physicians who

10 perform medical reviews must be compensated for their services. Actually, plaintiff's contention

11 is more slanderous; she implies (without offering evidence, or having the courage to so state

12 explicitly), that the reviewing doctors were on the take and were compensated to provide a

13 specific desired result – not for professional opinions, or for time spent reviewing materials in

14 arriving at them.

15        Plaintiff notes, in her own motion, that Dr. Krames billed for extra time spent reviewing

16 several hours of surveillance tapes, and implies that Aetna's agreement to pay for that extra time

17 was not merely compensation for time spent but was a bribe to entice him to opine in a certain

18 way. Similarly, she sneers that Dr. Marks is "no stranger to the courts" and cites two decisions

19 where his opinion was "rejected," but without explaining in any way the supposed relevance of

20 those decisions,[4] or the similarities, if any, between the facts in those cases and the facts here, nor

21 any context (for example, how many times his opinions have favored the claimant, or how many

22 times his opinions have been accepted by courts). If plaintiff truly had probative evidence about

23

24        [4] Those cases in any event have no bearing on the merits of this plaintiff's claim. Every
   disability case presents unique facts, and stands or falls on its own merits. Proof of disability is
25 always a plaintiff's burden, and summary judgment is warranted here because this plaintiff did
   not establish a functional impairment rendering her disabled under the Plan. *Jordan v Northrop*
26 *Grumman Corp. Welfare Benefit Plan*, 63 F. Supp. 2d 1145, 1157 (C.D. Cal. 1999); *see Martin
   v. Continental Cas. Co.*, 96 F.Supp.2d 983, 994 (N.D. Cal. 2000); *see also Semien v. Life Ins. Co.*
27 *of North America*, 436 F. 3d 805 (7th Cir. 2006). Nothing that plaintiff has raised calls into
   question the propriety of the decision on her claim. Aetna did not abuse its discretion in denying
28 the claim, and defendants therefore are entitled to judgment in their favor.

1    the purported bias of the reviewers, she should present it in some admissible fashion. Having

2    none, she instead relies on innuendo.

3        What plaintiff really contends is that because the reviewing doctors provided their

4    services *to an insurer*, their professional work simply cannot be credited. This is merely a

5    disguised argument for revival of the discredited "treating physician rule," which the Supreme

6    Court has specifically rejected. *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834

7    (2003). But plaintiff's "they must be biased and non-credible because the insurer pays them"

8    argument has been rejected on other grounds as well. *See Davis v. Unum Life Ins. Co. of*

9    *America,* 444 F.3d 569 (7th Cir. 2006) at 575 (citations omitted):

10            The source of Davis's argument is Unum's in-house doctors.
               However, whether a doctor is in-house or not is an irrelevant
11            distinction in this context. To start, plan administrators have a duty
               to all plan participants and beneficiaries to investigate claims and
12            make sure to avoid paying benefits to claimants who are not
               entitled to receive them. . . . Further, an administrator's decision to
13            "seek[ ] independent expert advice is evidence of a thorough
               investigation." . . . . When an administrator, like Unum here, opts
14            to investigate a claim by obtaining an expert medical opinion-
               independent of its own lay opinion and that of the claimant's
15            doctors-the administrator is going to pay a doctor one way or
               another. . . . Thus, whether the administrator retains in-house
16            doctors (arguably reducing overhead costs for the benefit of the
               plan's participants and beneficiaries) or pays for freelance doctors
17            makes no difference in this conflict analysis. Paying for a
               legitimate and valuable service in order to evaluate a claim
18            thoroughly does not create a review-altering conflict.

19        Plaintiff also faults Aetna for conducting the FCE and cites to cases saying that an FCE is

20    not useful. Not all courts agree. For example, in *Lake v. Hartford Life and Acc. Ins. Co.,* 320

21    F.Supp.2d 1240 (M.D. Fla. 2004) (internal punctuation omitted), the court placed superlative

22    value on the use of an FCE:

23            [T]he Court agrees with Hartford that a functional capacity
               evaluation is the best means of assessing an individual's functional
24            level. In a situation such as in this case in which there is one FCE
               conducted by a provider who was referred by the plaintiff's own
25            treating physician, and the plaintiff has provided no medical
               records to refute the findings in the FCE, Hartford was not
26            "wrong" in relying on the FCE. The FCE indicated that Lake
               demonstrated poor effort while taking the examination, and as
27            noted by [Hartford's medical records review consultant] Dr.
               Wagner, [i]t is often the case that an individual is not motivated to
28            perform at their maximal level of functionality in the setting of a
               functional capacity evaluation. Despite these limitations, this

                                    -17-                    CASE NO. C 07-03019 CRB

1
2

> functional capacity evaluation remains the most accurate means to
> assess Ms. Lake's functionality.

3  *Id.* at 1249. Aetna's determination was rationally based on the information in the administrative
4  record. The determination was not an abuse of discretion as a matter of law, and should be
5  upheld by the Court.

6  **D.    Past Receipt of Plan Benefits Does Not Require Continued Payment**

7          The fact that plaintiff had received Plan benefits for a period of time does not mean that
8  the Plan and its claim administrator were required to continue to pay her unless they proved some
9  extraordinary change in her condition. The burden of proof was on plaintiff at the time Plan
10  benefits terminated to demonstrate that she was functionally unable to work at any occupation.
11  *Jordan v. Northrop Grumman Corp. Welfare Ben. Plan*, 370 F.3d 869, 876 (9th Cir. 2004). An
12  argument that once any benefits had been paid the burden of proof shifted to the Plan or its claim
13  administrator would be wrong, as discussed in *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979
14  (6th Cir. 1991). "Under the terms of the Plan, it is the employee who must continue to supply on
15  demand proof of continuing disability to the satisfaction of the insurance company." *Id.* at 985.

16          Aetna continually sought proof from plaintiff and her doctor that she was functionally
17  impaired and therefore disabled under the Plan terms, and shared with her doctor the surveillance
18  videos showing plaintiff's actual daily activities, as well as the medical opinions of the reviewing
19  doctors who interpreted the surveillance videos. The burden of proof never shifted to Aetna to
20  prove that she was not disabled, however; that is particularly true, given that she was receiving
21  benefits all the while Aetna reviewed and evaluated her condition through multiple personal
22  examinations as well as widely spaced surveillance events.[5] Moreover, the Plan was not required
23  to demonstrate a significant change in plaintiff's condition before it could terminate benefits. As
24  explained in *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F. 3d 262 (5th Cir. 2004):

25

26      [5] That is, Aetna approached surveillance in a manner calculated to yield a true picture of
    plaintiff's condition, not merely a one-shot observation which might have been considered an
27  anomaly standing alone. The two series of surveillance videos, however, taken together show
    what plaintiff's actual activities were over an extended period, and therefore were a reasonable
28  basis for the conclusions reached with regard to her claimed continued inability to work.

-18-                                CASE NO. C 07-03019 CRB

> We hold that when a plan fiduciary initially determines that a
> covered employee is eligible for benefits and later determines that
> the employee is not, or has ceased to be, eligible for those benefits .
> . . the plan fiduciary is not required to obtain proof that a
> substantial change . . . occurred after the initial determination of
> eligibility. Indeed, evidence could exist – as it did here – at the
> time that the plan fiduciary initially granted benefits that
> demonstrates that the ERISA plaintiff is not totally disabled. In
> addition, a plan fiduciary could receive evidence that an ERISA
> plaintiff is not totally disabled months after it has made the initial
> grant of benefits. A contrary holding would basically prohibit a
> plan fiduciary from ever terminating benefits if it later discovered
> evidence that the ERISA plaintiff was not disabled at the time of
> the initial grant of benefits. More importantly to plan participants
> and beneficiaries, such a rule would have a chilling effect on the
> promptness of granting initial benefits in the first place. This we
> are unwilling to do. A plan fiduciary that has granted plan benefits
> . . . is not estopped from terminating those benefits merely because
> there is no evidence that a substantial change in the . . . medical
> condition occurred after the original grant of benefits.

*Id*. at 274 (footnotes omitted).  When confronted with the results of the surveillance, the IME, the

FCE and the medical records reviews, plaintiff failed to produce evidence of actual functional

impairment. *See Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 17 n.5 (1st Cir. 2003)

("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to

objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do

lend themselves to objective analysis."). In the circumstances, it was not an abuse of discretion

for Aetna to accept the reviewing physicians' opinions and terminate Plan benefits on that basis.

## E.    Receipt of SSDI Benefits Is Not Determinative of Plan Benefits

Plaintiff contends that Aetna failed to take into account that she received Social Security

Disability Insurance ("SSDI") benefits, implying thereby that she necessarily is entitled to

continued receipt of Plan benefits. This amounts to an argument that one who receives SSDI

benefits must necessarily receive Plan LTD benefits. Not so.

Nothing in ERISA law required the Plan to accept an SSDI award as proof of eligibility

for Plan benefits in perpetuity, however.[6]  In fact, the Supreme Court held that nothing in ERISA

requires a Plan to accept an SSDI award as proof even of initial eligibility for Plan benefits, in

---

[6] This is particularly true, since SSDI awards are not typically reevaluated, once approved.

1  *Black & Decker v. Nord*, 538 U.S. 822, 825 (2003), stating, "Plan administrators are not

2  obligated to accord special deference to the opinions of treating physicians."

3      This is so, because the rules and standards set forth in the Social Security Act and in the

4  interpreting case law – and, in particular, the so-called treating physician rule, under which the

5  opinion of a Social Security applicant's physician is controlling – are unique to that statutory

6  scheme, and have no bearing on decisions under ERISA plans:

7          In contrast to the obligatory, nationwide Social Security program,
"[n]othing in ERISA requires employers to establish employee

8  benefits plans. Nor does ERISA mandate what kind of benefits
employers must provide if they choose to have such a plan." . . .

9  Rather, employers have large leeway to design disability and other
welfare plans as they see fit. In determining entitlement to Social

10  Security benefits, the adjudicator measures the claimant's condition
against a uniform set of federal criteria. "[T]he validity of a claim

11  to benefits under an ERISA plan," on the other hand, "is likely to
turn," in large part, "on the interpretation of terms in the plan at

12  issue." . . . It is the Secretary of Labor's view that ERISA is best
served by "preserv[ing] the greatest flexibility possible for . . .

13  operating claims processing systems consistent with the prudent
administration of a plan."

14

15  *Nord, supra,* 538 U.S. at 833 [citations omitted]; *see also Madden v. ITT Long Term Disability*

16  *Plan,* 914 F.2d 1279, 1285 (9th Cir. 1990) (ERISA benefit decisions are not required to track or

17  conform to Social Security decisions).

18      Unlike the Social Security Administration, the Plan and its claim administrator were not

19  required to follow a treating physician rule, and are not bound by a determination issued by that

20  agency. The Social Security Administration's determination is separate from, and governed by a

21  different standard from, claim adjudications under the Plan. The decision on plaintiff's claim for

22  Plan benefits was appropriate, and that result is not called into question by her receipt of Social

23  Security benefits. Accepting such an argument would require that private disability benefits be

24  adjudged coextensive with Social Security disability benefits. *Nord* holds to the contrary.

25  **III.    CONCLUSION**

26      The Plan's claim administrator did not abuse its discretion in making the decision to

27  terminate Plan benefits to plaintiff. The evidence that Aetna gave plaintiff's claim a lengthy and

28  full review is clear in the record.

1    None of that record satisfies plaintiff, however, and it is clear that none could, if she is to

2 maintain her fevered contention that this case is a "poster child for bad faith" as she says in her

3 own motion.[7] Apparently, plaintiff's argument is that viewing her doctor's multiple reports about

4 her "improved" condition as inconsistent with an opinion of total disability from sedentary work

5 was "bad faith." Conducting surveillance was "bad faith." Conducting further surveillance to

6 get a fuller picture was "bad faith." Giving all of the evidence, including the surveillance results,

7 to the IME physician was "bad faith." Compensating the IME physician and an independent

8 medical reviewer who is Board certified in rheumatology was "bad faith." Using a reviewer who

9 has been used by other insurers was "bad faith." Conducting an FCE and drawing a conclusion

10 from it that conflicts with plaintiff's self-report of her condition was "bad faith."

11    Plaintiff has an answer for everything – and her answer is that Aetna "must" have abused

12 its discretion in terminating Plan benefits, given that its conclusion about her ability to hold a

13 sedentary job differs from hers. That is not, however, the definition of an abuse of discretion in

14 this Circuit. Aetna's decision should be upheld by this Court and judgment should be entered in

15 favor of the defendants.

16

17 DATED: February 22, 2008        SEDGWICK, DETERT, MORAN & ARNOLD LLP

18
                                 By: _____
19
                                 Rebecca A. Hull
20                               Attorneys for Defendants
                                 Kaiser Foundation Health Plan, Inc., and Kaiser
21                               Permanente Welfare Benefit Plan

22

23

24

25

26    _____

27        [7] Plaintiff apparently has lost sight of the fact that this is an ERISA case, and that the issue
    before the Court is whether the denial of further Plan benefits was an abuse of discretion – the
28    concept of "insurance bad faith" simply is not relevant here. *Pilot Life Ins. Co. v. Dedeaux*, 481
    U.S. 41 (1987).

DEFENDANTS' OPENING MSJ BRIEF