1  SEDGWICK, DETERT, MORAN & ARNOLD LLP
   REBECCA A. HULL  Bar No. 99802
2  One Market Plaza
   Steuart Tower, 8th Floor
3  San Francisco, California 94105
   Telephone: (415) 781-7900
4  Facsimile: (415) 781-2635

5  Attorneys for Defendants
   Kaiser Foundation Health Plan, Inc., and Kaiser
6  Permanente Welfare Benefit Plan

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11 | MARIE CHELLINO,                        | CASE NO. C 07-03019 CRB
12 |     Plaintiff,                         | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
13 |     v.                                 |
14 | KAISER FOUNDATION HEALTH PLAN, INC., AND DOES 1-10, | **DATE:  MARCH 28, 2008**
15 |     Defendant.                         | **TIME:  10:00 A.M.**
16 |                                        | **DEPT:  8**

17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

**PAGE**

I. INTRODUCTION ..................................................................................................................1

II. FACTS RELEVANT TO PLAINTIFF'S MOTION ..........................................................3

III. LEGAL ANALYSIS AND ARGUMENT ..........................................................................6

    A. Abuse of Discretion Review ........................................................................................6

    B. The Termination Decision Was Not an Abuse of Discretion ......................................9

    C. Past Receipt of Plan Benefits Did Not Require Continued Payment .......................11

    D. Receipt of SSDI Benefits Is Not Determinative of Plan Benefits ............................12

IV. CONCLUSION ...................................................................................................................13

# TABLE OF AUTHORITIES

**PAGE**

## FEDERAL CASES

*Abatie v. Alta Health & Life Ins. Co.*,
    458 F.3d 955 (9th Cir. 2006) ............................................................................. 6, 7, 8

*Bendixen v. Standard Ins. Co.*,
    185 F.3d 939 (9th Cir. 1999) ....................................................................................6

*Black & Decker Disability Plan v. Nord*,
    538 U.S. 822 (2003) ........................................................................................... 9, 10

*Boardman v. Prudential Ins. Co. of Am.*,
    337 F.3d 9 (1st Cir. 2003) ...................................................................................... 12

*Crume v. Metropolitan Life Ins. Co.*,
    417 F. Supp. 2d 1258 (M.D. Fla. 2006) ................................................................. 10

*Davis v. Unum Life Ins. Co. of America*,
    444 F.3d 569 (7th Cir. 2006) .................................................................................. 10

*Donato v. Metro. Life Ins. Co.*,
    19 F.3d 375 (7th Cir. 1994) ......................................................................................9

*Ellis v. Liberty Life Assur. Co. of Boston*,
    394 F.3d 262 (2004) ..................................................................................................8

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*,
    370 F.3d 869 (9th Cir. 2003) ............................................................................ 10, 11

*Lake v. Hartford Life and Acc. Ins. Co.*,
    320 F. Supp. 2d 1240 (M.D. Fla. 2004) ........................................................... 10, 11

*Madden v. ITT Long Term Disability Plan*,
    914 F.2d 1279 (9th Cir. 1990) ................................................................................ 12

*Maniatty v. UNUMProvident Corp.*,
    218 F. Supp. 2d 500 (S.D.N.Y. 2002) .................................................................... 10

*Maynard v. City of San Jose*,
    37 F.3d 1396 (9th Cir. 1994) ....................................................................................9

*Miller v. Metropolitan Life Ins. Co.*,
    925 F.2d 979 (6th Cir. 1991) .................................................................................. 11

*Oster v. Barco of Cal. Employees Retirement Plan*,
    869 F.2d 1215 (9th Cir. 1998) ..................................................................................9

*Semien v. Life Ins. Co. of North America*,
    436 F.3d 805 (7th Cir. 2006) .................................................................................. 10

*Sweatman v. Commercial Union Ins. Co.*,
    39 F.3d 594 (5th Cir. 1994) ......................................................................................9

*Taft v. Equitable Life Assur. Soc'y*,
   9 F.3d 1469 (9th Cir. 1993) ................................................................................................ 6

**FEDERAL STATUTES**

29 C.F.R. § 2560-503-1(h)(3)(iii), (4) ............................................................................. 10

29 U.S.C. § 1001 ................................................................................................................ 1

## I. INTRODUCTION

Defendants Kaiser Foundation Health Plan, Inc. ("KFHP") and Kaiser Permanente Welfare Benefit Plan ("Plan") moved for summary judgment on the claims of plaintiff Marie Chellino under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and plaintiff also moves for summary judgment. The evidence and law supporting defendants' motion requires that plaintiff's motion be denied.[1]

As shown in defendants' motion, as of June 30, 1999, Plan benefits were funded by a group policy of long term disability ("LTD") insurance issued by New York Life Insurance Company and assumed by Aetna Life Insurance Company ("Aetna"), which also was the claim administrator. The Plan's grant of discretion to Aetna is undisputed, as plaintiff's motion concedes. She nevertheless argues vehemently that no discretion should be afforded the decision that she was not eligible for benefits after June 2006.

Plaintiff's motion, stripped of its fevered hyperbole and examined against the evidence, reveals that there is no legal basis for her contention that Aetna abused its discretion when it determined that she had reached a point where she reasonably could be expected to perform sedentary work, and thus no longer was eligible for Plan benefits. Her account of the facts is selective in the extreme.[2]

For instance, plaintiff says that she told Dr. Krames (who conducted an independent medical examination ["IME"] and record review in June 2005) that she visited her horse and sometimes rode it, and that he therefore could have learned nothing new from the surveillance results he received a few weeks after the IME (she dismisses the surveillance records as

---

[1] Defendants will avoid, where possible, any extended repetition of their MSJ brief arguments and, to avoid unnecessary burden on the Court, will refer the Court to specific portions of their MSJ papers as appropriate. A detailed chronological discussion of the facts is set out in defendants' MSJ brief, at pp. 4-10.

[2] In some instances, plaintiff's recitations are simply false. For instance, she attempts to downplay the surveillance by saying it showed her "carrying an empty plastic bucket against her chest." Plt. MSJ, 5:1-2. The report says she was seen carrying two buckets, not one, and she was not carrying them "against her chest" (rather, they were carried in one or the other of her hands, or under one or the other of her arms, or with both hands, or on her hip). The suggestion that the buckets were "empty" or "plastic" is simply fiction – the reports say no such thing; in fact, the full discussion appears to indicate that plaintiff was using these buckets to transport things, not merely carrying them, empty, from place to place in the stable area. (ADMIN 1- 16.)

1  unremarkable). *See* Plaintiff's Motion for Summary Judgment ("Plt. MSJ"), pp. 6-7.[3]  From that
2  premise, she contends that only bribery could account for his rejection, in his supplemental report,
3  of her claimed lack of functionality. Plaintiff misses the point of Dr. Krames' supplemental report
4  issued following review of the surveillance records. It was, in fact, the very ordinariness of the
5  activities that, in Dr. Krames' opinion, made the results of the surveillance medically noteworthy –
6  much of the medical significance was in what was not shown.[4]

7       Further, plaintiff's motion ignores that her attending physician, Dr. Padgett, repeatedly
8  reported to Aetna that she continued to improve "tremendously,"[5] albeit he acquiesced to her
9  desire for prolongation of disability status, uncritically accepting her subjective complaints. *See*
10 ADMIN 295, 311. When Dr. Padgett was asked to comment on the 2004 surveillance, he did not

---

[3] Plaintiff dismisses her horseback riding as medically meaningless, saying that in the video she is shown mounting the horse "from a platform," making it sound as though she reached the top via a ramp. Plt. Opp., 7:5. To say the least, this is an extraordinary understatement. What the video actually shows (see screen prints of ADMIN 1583 at 5:35:30 p.m., attached as Exhibit A to this brief for the Court's convenient reference) is plaintiff standing next to a sawhorse, the top of which comes to approximately mid-thigh level, and stepping up to the top of it (*i.e.*, about 30 inches) in a single step with her right leg (such that her right knee was above waist level while her left foot was on the ground; she then lifted her left leg to the top of the sawhorse, also in one motion, and swung her right leg over the saddle in one motion). The sawhorse has intermediate horizontal bars that could have been used as incremental steps, but plaintiff did not need or use them – and, as Dr. Krames noted in his supplemental report, her movements were fluid and done with no indication of pain (*i.e.*, she did not accomplish this action with grimaces, or hesitation, or any apparent difficulty). Earlier, at approximately 5:33 p.m., plaintiff was, as Dr. Krames' supplemental report noted, recorded pulling the horse along by his bridle with no difficulty. Although Dr. Krames did not discuss it, the pictures of plaintiff's van, loaded with bulky supplies clearly in excess of two pounds (or even five pounds) in weight (*see* ADMIN 14), from which she is seen retrieving various items, also belies her attempt to portray her equestrian activities as only infrequent and casual.

[4] As Dr. Krames pointed out in his second report, after seeing plaintiff interact in her daily environment, *the surveillance results were markedly different from her representations to him* during the IME in June 2005. (ADMIN 444-49.) He noted in particular that the surveillance showed the plaintiff was walking without antalgic gait, and without any degree of pain behavior. He pointed out that he could see her using her hands at will, pulling horses, lifting herself onto a horse without difficulty and without any degree of pain behavior, bending at the waist, turning left and right, turning her neck left and right without any painful expressions, and holding objects that appeared to be more than two pounds without having to hold them against her chest (as she had claimed was necessary). Dr. Krames concluded, based on the behaviors and physical activities observed (and the contrast with how she had behaved and what she had told him at the IME), that plaintiff was *not* severely limited and that she could perform a sedentary job involving fine manipulation, and could hold objects weighing up to five pounds. (*Id.*)

[5] For instance, the 2004 surveillance included observations of plaintiff not only leading two horses around a stable area, but also on two occasions pulling open a large chain link gate to take the horses into a corral area. (ADMIN 780-89, at p. 785.)

1  evaluate or discuss plaintiff's activities from a medical standpoint but merely repeated, in the

2  manner of an advocate, her claim (as to which he had no personal knowledge) that she wore

3  braces that were not seen by the investigator. (ADMIN 225-28.) In the next surveillance session,

4  however, the investigator noted that within the space of a few hours, plaintiff was seen sometimes

5  wearing braces, and sometimes not wearing braces – although she undoubtedly was warned by

6  Dr. Padgett that she might be under observation. (*See* ADMIN 764-779, at p. 765.)

## II.     FACTS RELEVANT TO PLAINTIFF'S MOTION

8       A chronological discussion of facts relevant to plaintiff's motion is set out in defendants'

9  MSJ brief, at pp. 4-10. Without repeating the full discussion, defendants highlight the following.

10      Plaintiff's motion blusters that no one could in good faith have believed that she had

11 improved to a point that it was reasonable for her to be expected to seek and hold a sedentary job.

12 She supports that proposition with unfounded attacks on the motives and morals of everyone who

13 considered her claim, even going so far as to imply (with no evidence to support her attack) that

14 any doctors who disagreed with her self-reports of incapacity must have been bribed to do so.

15 This smokescreen seems intended to obscure salient points in the administrative record – such as

16 her treating doctor's multiple reports to Aetna that she had greatly improved, and multiple

17 surveillance results and medical opinions discrediting her self-reported limitations.

18      The simple fact is that the June 2005 IME by Dr. Krames found no basis for the claimed

19 disability, *other than plaintiff's subjective assertion* that she supposedly was incapable of working

20 even in a sedentary job. As Dr. Krames pointed out in his report, her test results and other clinical

21 observations were essentially normal; and it was only on the basis of her claimed subjective

22 symptoms that he found her disabled.[6] (ADMIN 326-40.) When Dr. Krames received and

23 analyzed the surveillance results,[7] however, he discovered that what plaintiff actually was

---

[6] In light of this *caveat* to the initial report – that Dr. Krames was opining that plaintiff was disabled only on the strength of her assertion that she was functionally incapacitated – it is hardly surprising that an Aetna claim representative commented in file notes that a review of the surveillance results, showing plaintiff's actual level of activity and functionality, might have an impact on Dr. Krames' assessment. (*See* Plt. MSJ at 6:6-7.)

[7] The record indicates that the initial submission forwarding the surveillance materials to Dr. Krames was lost, resulting in delayed receipt of his supplemental report. (*See* ADMIN 1328.)

1  observed doing was contrary to what she had told him she was capable of doing – and since her

2  self-report was the only basis for his conclusion of disability, his conclusion understandably

3  changed based upon his ability to observe her actual functionality.[8]

4        Following the multiple medical evaluations, Aetna performed a labor market survey on

5  July 5-6, 2006, which identified existing and available jobs that plaintiff could perform within the

6  limitations identified in Dr. Krames' supplemental IME report, after taking account of the

7  activities he observed her performing.  (ADMIN 487-512.)  An August 31, 2006, letter notified

8  plaintiff that Plan benefits were being terminated, based on the results of all of the file reviews and

9  examinations, as well as the surveillance reports.  (ADMIN 841-45.)

10        In an attempt to dispute that plaintiff's claim received a "full and fair review," her current

11  counsel offers an argument that is puzzling at best.  He claims that he *personally* did not see the

12  particular surveillance video that showed plaintiff riding a horse (although of course the written

13  surveillance reports also discuss that activity, as do a number of other documents – that is, he

14  does not claim to have been *unaware* that the video existed), until the administrative record was

15  produced during the litigation.  (Plt. MSJ, p. 10.)

16        Regardless of whether that is true – and it is difficult to credit, as that there is nothing in

17  the record indicating that he complained of not receiving that item – it is not relevant to the

18  apparent contention that there was no "full and fair review" because Aetna supposedly withheld

19  parts of the record.  As is set out in the factual history of the claim and appeal (defendants' MSJ,

20  pp. 4-10), the videos previously had been provided to her treating doctor for his review and

21  comment.  In addition, the complete administrative record previously had been provided to

22  plaintiff's prior counsel for use with her appeal, and plaintiff personally was copied on the letter

23  transmitting such materials.  (*See* ADMIN 526-27.)

---

25  [8] Similarly, notwithstanding plaintiff's attempts in her motion to explain away the report of the April 2006 functional capacities evaluation ("FCE"), the physical therapist who administered the
26  tests noted that plaintiff had refused to attempt many of the activities she was directed to do, and that the FCE therefore was not reliable as evidence that plaintiff could not do such things, but
27  only that she did not do them.  (*See* ADMIN 847-57.)  Plaintiff's argument that the FCE does not support termination of benefits stands that result on its head – in effect, claiming that because she
28  refused to participate meaningfully, the FCE could not be considered in terminating benefits.

1  Shortly thereafter, current counsel appeared. (ADMIN 531.) When current counsel made
2  a duplicative record request, Aetna as a courtesy sent more copies of file materials despite having
3  already provided the complete record to her prior counsel, rather than directing him to retrieve
4  from prior counsel the records that had been produced previously. (*See* ADMIN 532.) This was
5  a *courtesy*, however, as any legal obligation to plaintiff with regard to producing the records
6  already had been met, particularly given that there was no indication that plaintiff's prior counsel
7  (and/or her doctor) refused to turn over the complete records in their possession.

8  After receipt of voluminous additional materials submitted by plaintiff in support of her
9  appeal, Aetna submitted the full file for review by an independent physician consultant, Alan
10 Marks, M.D.,[9] who is Board-certified in internal medicine and in rheumatology. (ADMIN 900-
11 02.) Dr. Marks reported that plaintiff's sub-optimal responses during the FCE indicated to him a
12 motivation to continue to receive LTD benefits. He further observed that the surveillance videos
13 contradicted her extreme subjective reports of functional disability. (*Id.*)[10]

14 The issue presented by plaintiff's motion is whether, despite the substantial evidence
15 discussed above and in defendants' moving papers, Aetna abused its discretion in crediting the

---

[9] Plaintiff attempts to discredit Dr. Marks' report by means of two unreported opinions in which courts rejected his conclusions in favor of those urged by a claimant. (*See* Plt. MSJ, pp. 10-11.) All disability claims are specific to their facts, however, and a court's determination (particularly on a *de novo* review, as was the case with one of those decisions) that a claimant should prevail has no bearing on whether Aetna (which was not a party to either of these cases) abused its discretion in relying on Dr. Marks' report in deciding plaintiff's appeal.

[10] Dr. Marks particularly found Dr. Krames' IME instructive, because Dr. Krames' initial report (based on plaintiff's self-reported symptoms) agreed that she could not work (although clearly stating that this was not based on objective abnormalities, but only on plaintiff's self-report). As Dr. Marks commented, however, upon reviewing the surveillance showing actual activity levels and abilities, Dr. Krames changed his conclusion as to work ability. Dr. Marks reported that his own view mirrored Dr. Krames' ultimate finding, observing that the treating doctor also repeatedly noted how much plaintiff improved, yet continued to accept a self-report of pain that allegedly never diminished, merely noting what plaintiff had said – that she cannot work because of pain. Dr. Marks further pointed out that the treating doctor did not document, by examination, x-rays or testing, any objectified musculoskeletal or neuromuscular abnormalities that would impair plaintiff from working. (*Id.*)

Plaintiff's statement that Dr. Marks and Dr. Krames were in disagreement (Plt. MSJ p. 11) is inexplicable. Apparently, she means that Dr. Krames' original opinion – before he had seen the surveillance results showing her actual activities and capabilities – was favorable to her. Given that Dr. Krames found the surveillance results to contradict the history plaintiff gave him, and on that basis reversed his initial acceptance of her claimed lack of functional ability, it is difficult to discern how Dr. Krames and Dr. Marks could be said to be in disagreement.

1  opinions of experts who found that plaintiff's actual abilities did not preclude sedentary work.

## III.  LEGAL ANALYSIS AND ARGUMENT

The Plan explicitly grants discretion to Aetna with regard to the type of decision in issue here. When a fiduciary's claim decision is reviewed for abuse of discretion, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." (*Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999.)) A court is not permitted to substitute its judgment for that of the fiduciary, unless the decision was clearly erroneous in light of the available record, or there was no reasonable basis for it. (*Id*. at 944.)

As plaintiff admits, the appropriate standard of review in this Court is abuse of discretion. Where, as here, there is relevant evidence "that reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence, the decision must be upheld" on review by a court. *Taft v. Equitable Life Assur. Soc'y*, 9 F.3d 1469, 1473 (9th Cir. 1993). On the evidence, Aetna did not abuse its discretion in terminating Plan benefits and its decision is entitled to substantial deference. Indeed, fiduciary obligations to other participants and beneficiaries would be violated if benefits continued to be paid to a person who no longer was eligible for them.

### A.  Abuse of Discretion Review

Plaintiff and defendants agree that the Ninth Circuit opinion in *Abatie v. Alta Health & Life Ins. Co*., 458 F.3d 955 (9th Cir. 2006) (*en banc*) is the standard by which this Court will decide the degree of discretion to afford the decision of the claim administrator to terminate plaintiff's benefits after consideration of multiple medical reviews and photographic evidence showing that her claimed level of incapacity had improved to the point that sedentary work no longer was precluded. The parties disagree, however, as to what that standard means here. In addition, plaintiff misstates *Abatie*, arguing that mere existence of a structural conflict (because Aetna funds benefits and also decides claims) precludes deference.

Nothing in *Abatie* supports plaintiff's argument – *Abatie* stands, rather, for the proposition that a court <u>may</u>, although it is not <u>required</u> to – consider extra-record evidence that a structural

1 conflict has affected a claim decision. "A district court, when faced with all the facts and
2 circumstances, must decide in each case how much or how little to credit the plan administrator's
3 reason for denying insurance coverage." *Id.* at 968. "When an administrator can show that it has
4 engaged in an 'ongoing, good faith exchange of information between the administrator and the
5 claimant,' the court should give the administrator's decision broad deference …." *Id*. at 972.
6 Defendants submit that this standard is fatal to plaintiff's argument that Aetna's decision is
7 entitled to little or no deference. As the discussion above and in defendants' opening brief makes
8 clear, there was a prolonged and good faith exchange of information and views between Aetna,
9 plaintiff's doctors, and plaintiff's counsel – as early as 2004, for instance, her treating doctor was
10 provided with the video surveillance results, and was asked to comment on her activities.

11 Notwithstanding the inflammatory tone of plaintiff's argument, there is no basis in fact or
12 in evidence for the sinister suggestion that only a nefarious plot could explain why benefits were
13 terminated after ten years of not working (during the latter part of which period, plaintiff's doctor
14 reported on multiple occasions that her condition was "tremendously" improved and improving).
15 The evidence in the record, negates this suggestion, and in fact demonstrates Aetna's good faith
16 and its efforts to investigate plaintiff's claim and give it a fair assessment.

17 As early as December of 2002 there were medical evaluations questioning whether
18 plaintiff's condition was so severe as to make her totally disabled for any occupation. (*See*
19 discussion in Defendants' MSJ, at 5:13-19.) Thereafter, evidence continued to appear to suggest
20 that plaintiff was not so disabled as to be incapable of working at some reasonable occupation,
21 since in the two years following, her own doctor reported several times that her condition was
22 improving. Aetna, however, did not immediately terminate benefits. Instead, it investigated
23 further, conducting a first round of surveillance in May of 2004.

24 The investigation and evaluation continued over two years, by which time the weight of
25 the evidence made it clear that the claim of total inability to work at any reasonable occupation
26 was no longer valid. Only then did Aetna terminate the claim. There was no rush to judgment; in
27 fact, during the period while her claim was under investigation, monthly benefits continued to be
28

1  paid without interruption.[11]  The investigation included not just a "paper review" of the claim, but
2  an IME, an FCE, and multiple instances of surveillance.  This is hardly the picture of a conflicted
3  administrator putting its own interests ahead of its duty to evaluate all claims fully and fairly and
4  pay only those that are truly valid.
5        There also is no evidence present, because there is none, of any of the other elements the
6  *Abatie* court enumerated as justifying a higher "level of skepticism."  There is no "evidence of
7  malice, of self-dealing, or of a parsimonious claims-granting history," nor has there been any
8  showing that Aetna "repeatedly denied benefits to deserving participants by interpreting plan
9  terms incorrectly or by making decisions against the weight of evidence in the record." *Id*. 968-
10 69.  Plaintiff also cannot show on this record that Aetna failed to adequately investigate her claim;
11 in fact, her claim is to the contrary, that Aetna should have done less investigation and given more
12 acceptance of her physician's view. *Id.* 968.  Plaintiff instead urges that Aetna runs afoul of the
13 *Abatie* caution against a structurally conflicted administrator that "fails to credit a claimant's
14 reliable evidence." *Id*.  But in making this argument, plaintiff ignores the fact that the evidence of
15 her treating physician was hardly "reliable" on its face (no objective findings of inability to work,
16 uncritical acceptance of plaintiff's subjective complaints, yet repeated notes that plaintiff's
17 condition was improving), or in consideration of other evidence in the file (such as the
18 surveillance).  Since plaintiff can point to no *Abatie* factor that Aetna violated, there is no basis
19 for application of any level of increased scrutiny of Aetna's claim decision.
20       Aetna's determination should therefore be afforded a high degree of deference, because
21 Aetna did exactly what it was supposed to do.  Its chief failing, in plaintiff's assessment, was that
22 it did not simply accept without question her subjective assertion, repeated by her doctor, that she
23 was unable to work despite her documented ability to carry on a normal life.  But Aetna's
24 fiduciary duty required otherwise, and the record is clear that Aetna fulfilled that duty, for it
25 engaged in an ongoing, good faith exchange of information.  Its determination must receive a high

---

[11] *See Ellis v. Liberty Life Assur. Co. of Boston,* 394 F. 3d 262, 272 n.23 (2004): "Although Ellis may urge that Liberty made its decision in bad faith, the fact that Liberty initially granted her LTD benefits under the Policy supports a finding of good faith on Liberty's part."

1  degree of deference under the circumstances.

2  **B.     The Termination Decision Was Not an Abuse of Discretion**

3  The issue for this Court, at bottom, is not whether Aetna's review could have been better
4  or whether a different decision would have been possible, but whether Aetna <u>abused</u> its discretion.
5  Under *Oster v. Barco of Cal. Employees Retirement Plan*, 869 F.2d 1215, 1218 (9th Cir. 1998),
6  a court will not interfere with a plan fiduciary's decision-making process unless the decision is so
7  "patently arbitrary and unreasonable as to lack foundation in factual basis and/or authority in
8  governing case or statute law." *Oster* further held that it would be improper for a court to
9  substitute its judgment for the judgment of the fiduciary, unless "the actions of the [fiduciary] are
10 not grounded on 'any reasonable basis'." *Id.*  Similarly, a fiduciary's decision will not be
11 overturned if evidence exists that a reasonable mind might accept as adequate to support the
12 decision, even if it is possible to draw two inconsistent conclusions from the evidence. *Maynard*
13 *v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994).

14 When the determination of a disability claim comes down to a permissible choice by the
15 administrator between (1) the assessment of an independent medical consultant, or (2) the
16 opinion of a treating physician, there is no abuse of discretion if the administrator relies on the
17 assessment of the consultant rather than that of the treating physician. *See Sweatman v.*
18 *Commercial Union Ins. Co.*, 39 F.3d 594, 602 (5th Cir. 1994) (citing *Donato v. Metro. Life Ins.*
19 *Co.*, 19 F.3d 375, 380 (7th Cir. 1994).  This is particularly so where, as here, the consultant's
20 assessment is supported by and consistent with the report of a physician who actually examined
21 the claimant, the report of an FCE, and multiple surveillance results.

22 Aetna's determination unquestionably was rationally based on the record, including the
23 multiple surveillance reports and videos and the findings of Drs. Krames and Marks, and well as
24 the physical therapist's observations regarding plaintiff's failure to participate in good faith in the
25 FCE.  Aetna was entitled to credit their opinions rather than the inconsistent, conclusory, and
26 unsupported assertions of plaintiff and her doctor. *See Black & Decker Disability Plan v. Nord,*
27 538 U.S. 822, 834 (2003); *Semien v. Life Ins. Co. of North America,* 436 F.3d 805, 812 (7th Cir.
28 2006); *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 877-78, 880

(9th Cir. 2003); *Maniatty v. UNUMProvident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002); *Crume v. Metropolitan Life Ins. Co.*, 417 F. Supp. 2d 1258, 1262-63, 1266-68 (M.D. Fla. 2006). *See also* 29 C.F.R. § 2560-503-1(h)(3)(iii), (4).

What plaintiff really contends is that because the reviewing doctors provided their services *to an insurer*, their professional work simply cannot be credited. This is merely a disguised argument for revival of the discredited "treating physician rule," which the Supreme Court has specifically rejected. *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003). But plaintiff's "they must be biased and entitled to no credence because the insurer pays their bills" argument has been rejected on other grounds as well. *See*, *e.g.*, *Davis v. Unum Life Ins. Co. of America,* 444 F.3d 569, 575 (7th Cir. 2006) (citations, internal punctuation omitted):

> The source of Davis's argument is Unum's in-house doctors. However, whether a doctor is in-house or not is an irrelevant distinction in this context. To start, plan administrators have a duty to all plan participants and beneficiaries to investigate claims and make sure to avoid paying benefits to claimants who are not entitled to receive them. . . . Further, an administrator's decision to seek independent expert advice is evidence of a thorough investigation. . . . When an administrator, like Unum here, opts to investigate a claim by obtaining an expert medical opinion – independent of its own lay opinion and that of the claimant's doctors – the administrator is going to pay a doctor one way or another. . . . Thus, whether the administrator retains in-house doctors (arguably reducing overhead costs for the benefit of the plan's participants and beneficiaries) or pays for freelance doctors makes no difference in this conflict analysis. Paying for a legitimate and valuable service in order to evaluate a claim thoroughly does not create a review-altering conflict.

Plaintiff criticizes Aetna for trying to obtain the FCE and cites to cases opining that an FCE is not useful, but not all courts agree. For example, in *Lake v. Hartford Life and Acc. Ins. Co.*, 320 F.Supp.2d 1240 (M.D. Fla. 2004) (internal punctuation omitted), the court placed high value on the use of an FCE:

> [T]he Court agrees with Hartford that a functional capacity evaluation is the best means of assessing an individual's functional level. In a situation such as in this case in which there is one FCE conducted by a provider who was referred by the plaintiff's own treating physician, and the plaintiff has provided no medical records to refute the findings in the FCE, Hartford was not "wrong" in relying on the FCE. The FCE indicated that Lake demonstrated poor effort while taking the examination, and as noted by [Hartford's medical records review consultant] Dr. Wagner, ***it is often the case that an individual is not motivated to perform at***

> *their maximal level of functionality* in the setting of a functional capacity evaluation. Despite these limitations, *this functional capacity evaluation remains the most accurate means to assess [plaintiff's] functionality*.

*Id*. at 1249 (emphasis added). Aetna's determination that plaintiff no longer was eligible for benefits under the Plan was rationally based on the information in the administrative record. The determination was not an abuse of discretion as a matter of law, and should be upheld.

### C. Past Receipt of Plan Benefits Did Not Require Continued Payment

The fact that plaintiff received Plan benefits for a period does not mean that the Plan was required to continue to pay her unless defendants proved some extraordinary change in her condition. Rather, the burden of proof is on a claimant at all times to demonstrate that she is functionally unable to work at any reasonable occupation. *Jordan v. Northrop Grumman Corp. Welfare Ben. Plan*, 370 F.3d 869, 876 (9th Cir. 2004).

Aetna continually sought proof that plaintiff was functionally impaired and thus disabled under the Plan, and it shared with her doctor the surveillance videos showing plaintiff's actual daily activities, as well as medical opinions of the reviewing doctors who interpreted the surveillance videos. Nevertheless, the burden of proof never shifted to Aetna to prove that she was not disabled, particularly given that she was receiving benefits all the while Aetna reviewed and evaluated her condition through multiple record reviews as well as personal examinations and widely spaced surveillance events. That is, Aetna approached surveillance in a manner calculated to yield a true picture of plaintiff's condition, not merely a one-shot observation which might have been dismissed as an anomaly standing alone. The two periods of surveillance, taken together show what plaintiff's actual activities were over an extended period, and thus were a reasonable basis for the conclusions reached with regard to her claimed continued inability to work. Aetna did not rely on "catching" her on her "one good day."

The argument that, if any benefits were paid the burden of proof then shifted to the Plan is wrong, as discussed in *Miller v. Metropolitan Life Ins. Co*., 925 F.2d 979 (6th Cir. 1991). "Under the terms of the Plan, it is the employee who must continue to supply on demand proof of continuing disability to the satisfaction of the insurance company." *Id.* at 985. The Plan was not

required to demonstrate a significant change in plaintiff's condition before it could terminate benefits. As explained in *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F. 3d 262 (5th Cir. 2004):

> We hold that when a plan fiduciary initially determines that a covered employee is eligible for benefits and later determines that the employee is not, or has ceased to be, eligible for those benefits . . . the plan fiduciary is not required to obtain proof that a substantial change . . . occurred after the initial determination of eligibility. Indeed, evidence could exist – as it did here – at the time that the plan fiduciary initially granted benefits that demonstrates that the ERISA plaintiff is not totally disabled. In addition, a plan fiduciary could receive evidence that an ERISA plaintiff is not totally disabled months after it has made the initial grant of benefits. A contrary holding would basically prohibit a plan fiduciary from ever terminating benefits if it later discovered evidence that the ERISA plaintiff was not disabled at the time of the initial grant of benefits. More importantly to plan participants and beneficiaries, such a rule would have a chilling effect on the promptness of granting initial benefits in the first place. This we are unwilling to do. A plan fiduciary that has granted plan benefits . . . is not estopped from terminating those benefits merely because there is no evidence that a substantial change in the . . . medical condition occurred after the original grant of benefits.

*Id*. at 274 (footnotes omitted). Despite receiving results of the surveillance, IME, FCE and medical records reviews, plaintiff failed to demonstrate actual functional impairment. *See Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9 (1st Cir. 2003) ["While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, **the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis**"] (*id.* at 17 n.5, emphasis added). It was not an abuse of discretion for Aetna to terminate Plan benefits.

**D.    Receipt of SSDI Benefits Is Not Determinative of Plan Benefits**

Plaintiff contends that Aetna ignored that she received Social Security Disability Insurance ("SSDI") benefits, implying thereby that she necessarily was entitled to continued Plan benefits. She is wrong.

Nothing in ERISA law required the Plan to accept an SSDI award as proof of eligibility for Plan benefits in perpetuity. In fact, the Supreme Court has held that nothing in ERISA requires a Plan to accept an SSDI award as proof even of initial eligibility for Plan benefits. *See*

1  *Nord*, *supra*, at 825 (2003): "Plan administrators are not obligated to accord special deference to
2  the opinions of treating physicians." *See also Madden v. ITT Long Term Disability Plan*, 914
3  F.2d 1279, 1285 (9th Cir. 1990) (ERISA benefit decisions are not required to track or conform to
4  Social Security decisions).

## IV.  CONCLUSION

6  The Plan's claim administrator did not abuse its discretion in making the decision to
7  terminate Plan benefits to plaintiff. The administrative record shows that Aetna gave plaintiff's
8  claim a lengthy and full review, but decided against her.  That does not equate to an abuse of
9  discretion.  Plaintiff's rhetoric about her claim as a "poster child for bad faith" cannot take the
10 place of legal and factual support for her position – of which she offers none.

11 Plaintiff has an answer for everything:  if the investigator saw her doing things that were
12 inconsistent with functional incapacity, then he just didn't see the right things and everything
13 relevant happened "off camera."  Similarly, if a doctor reviewed her records at Aetna's request, he
14 must have been bribed to provide an opinion that was unfavorable to her – no matter that the
15 evidence under consideration did not support continued disability status, only dishonesty could
16 cause someone to reject her claim.

17 At the end of the day, the question is whether, given all of the multitude of evidence in the
18 administrative record, the decision to terminate LTD benefits was an abuse of discretion.  On the
19 record, there was no abuse of discretion, and plaintiff's motion must be denied.

21 DATED: March 7, 2008                SEDGWICK, DETERT, MORAN & ARNOLD LLP

23                                      By:/s/ Rebecca A. Hull
                                            Rebecca A. Hull
24                                          Attorneys for Defendants
                                            Kaiser Foundation Health Plan, Inc., and Kaiser
25                                          Permanente Welfare Benefit Plan