CHARLES J. FLEISHMAN
Bar# 46405
A Professional Corporation
19839 Nordhoff Street
Northridge, California 91324
erisa@erisarights.com
Telephone: (818)350-6285
FAX: (818)350-6272
Attorney for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIE CHELLINO<br><br>　　　Plaintiff,<br><br>　vs.<br><br>KAISER FOUNDATION HEALTH PLAN, Inc<br>a corporation; DOES 1<br>through 10, inclusive,<br><br>　　　Defendants. | NO. C07-3019 CRB<br><br>PLAINTIFF'S REPLY BRIEF<br>IN SUPPORT OF HER MOTION<br>FOR SUMMARY JUDGMENT<br>Date:　March 28, 2008<br>Time:　10:00 a.m.<br>Courtroom 8<br>Judge Charles R. Breyer |

"Disability claimants should not be penalized for attempting to lead normal lives. . . . 'Many home activities are not easily transferable to . . . the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication.' . . . Only if the level of activity were inconsistent with the Claimant's stated limitations would these activities have any bearing on Claimant's credibility." Reddick v. Chater 157 F.3d 715, 722 (9th Cir. 1998). In Vertigan v. Halter 260 F.3d 1044, 1050 (9th Cir. 2001) the court wrote, "One does not need to be 'utterly incapacitated' in order to be disabled. In addition, activities such as walking in the mall and swimming are not necessarily transferable to the work setting with regard to the impact of pain. A patient may do these activities despite pain for therapeutic reasons, but that does not mean she

could concentrate on work despite the pain or could engage in similar activity for a longer period given the pain involved."

Until Dr. Krames viewed the surveillance videos, he agreed that Ms. Chellino was totally disabled and that the cause of her total disability was fibromyalgia. The only thing that changed Dr. Krames' mind was the later viewing of the surveillance videos. He never read the surveillance reports nor did he reexamine Ms. Chellino. Contrary to defendant's arguments that Ms. Chellino claimed that she could not function in the world and she obviously can as shown by the videos, Ms. Chellino told Dr. Krames and he knew from the records that she shopped, walked for 30 minutes at a time sometimes twice a day, talked, and walked and rode horses. Do the videos show activity by Ms. Chellino that contradicts what Dr. Krames believed about her when he wrote that she was totally disabled? Absolutely not.

Dr. Krames also knew, before he viewed the videos, that Ms. Chellino walked with her hands in her pockets to support her hands and arms, drove with pillows supporting her, and wore wrist braces and a neck brace at times. He knew that she was taking narcotic analgesics for pain and that she had cognitive problems. He was told that she could not sit long enough to perform productive work and that she carried only light objects and she carried them against her body rather than in her hands alone.

The only thing that could have changed Dr. Krames' mind about Ms. Chellino's state of disability was the videos. It is important that they be viewed. The surveillance reports were not read by Dr. Krames. He only viewed the videos and he attributes his change of opinion to the videos only. 439-440.[1] No matter

---

[1] Defense counsel has accused this writer of falsely describing to the court the content of the surveillance videos. Def's Brief footnote 2. I have written that the videos show Ms. Chellino carrying an empty plastic bucket against her chest. Defense counsel points out that it was not one bucket

what defense counsel saw in the videos that she reviewed, the videos given to the plaintiff show Ms. Chellino carrying only the lightest of objects[2], most of the time against her body; resting in her car; walking with her hands in her pockets; shopping with the help of a box boy; and riding the slowest horse imaginable.[3] Dr. Krames knew that she did all of these things when he found her totally disabled. 330.

---

but two; they were not empty and they were carried "in one or the other of her hands, or under one or the other of her arms, or with both hands, or on her hip." I never saw Ms. Chellino carrying more than one bucket at a time. Defense counsel seems to be relying not on the videos but on the surveillance report however she does not cite to the page of the report that says Ms. Chellino was carrying more than one bucket and, in any case, Dr. Krames relies solely on the videos. From a view of the videos, it looks like Ms. Chellino was carrying one bucket at a time and that it was empty and being carried, most of the time, against her some part of her body, hip chest or stomach, for support.

[2] Please note that Dr. Krames, after viewing the videos, limited Ms. Chellino to holding "objects up to 5 pounds." 440.

[3] Defense counsel finds it "difficult to credit" my allegation that Aetna did not send me during the administrative review the same surveillance videos that were sent to me after litigation began. Def's Opp. Brief 4/16. The plaintiff has submitted to the court, and sent a copy to the defendant, of the video given to me by Aetna during the administrative review, Exhibit 1585. Not only is there no horse back riding in the video, Exhibit 1585 contains scenes not to be found on the videos sent to me after litigation began. Exhibit 1585 contains scenes from April 17, 2005 at 6:11, 7:03, 8:00, 8:59 a.m. and April 18, 2005 at 1 p.m. that cannot be found on the videos sent to me after litigation began. How could I have possibly made a video that contains scenes that are not in the videos sent to me post litigation? Where would I have gotten them?

More importantly, if Aetna sent me something less than all of the surveillance, how do we know that it has given the court videos with all of the surveillance? I am assuming, but do not know and am now unsure, that the videos that I received post litigation are the same as were filed by the defendant with the court and the same that were showed to Dr. Krames.

In his second report, after viewing the videos, Dr. Krames wrote that Ms. Chellino "walked without antalgic gait." 439. This fact is a claimed basis for his changing his opinion from disability to no disability. An antalgic gait is a limp caused by painful pressure put on a leg when walking.[4] In fact, however, Dr. Krames knew that Ms. Chellino did not walk with an antalgic gait when he first examined her and found her to be totally disabled. Antalgic gait or not made no difference to him. No rational person can believe that someone with enough pain to cause an antalgic gait would voluntarily walk twenty minutes a day, sometimes twice a day, and sometimes up to an hour, as she told Dr. Krames she did. 330. Yet Dr. Krames, knowing that Ms. Chellino was a walker, still found her to be totally disabled. Further, his first report does not mention that she walked with a limp when he examined her, something an IME hired to evaluate disability would have been on the lookout for. The fact is that Dr. Krames knew that Ms. Chellino was not even complaining of leg pains. "Marie Chellino complains of pain all over her body including, but not limited to, pain in her throat, neck, shoulder, arms, wrists, hands, lower back, spine, head, chest, and mid back." 326. There was no reason for him to consider an antalgic gait until Aetna's desire to terminate her benefits became known to him.

The videos show Ms. Chellino wearing wrist braces bilaterally. The videos show her wearing a neck brace. The videos show her walking with her hands in her pockets. The FCE notes that she walks with her hands in her pockets. 854.

---

[4] "Antalgic gait refers to a posture or gait assumed in order to avoid or lessen pain. . . . The key concept to keep in mind when dealing with antalgic gait is that the patient will try to minimize the amount of weight applied to the painful limb or joint and the amount of time that weight is applied. The result is a limp, a decreased single support time for the affected limb, a shortened stride length for the contralateral limb, and an increased double support time. http://sprojects.mmi.mcgill.ca/gait/antalgic/intro.asp

On July 21, 2003, the plaintiff filled out an Aetna claim form in which she wrote, "I keep my hands/arms supported in my pockets." 36. Dr. Krames wrote, after viewing the videos, that Ms. Chellino "in **almost** every singe tape, walked without antalgic gait and without any degree of pain behavior seen." (emphasis added) 439. He knew she was wearing the wrist and neck braces to lessen pain. 327. He knew why she walked with her hands in her pocket. Surely he must have seen that when she entered her vehicle, she arranged pillows to make her driving more comfortable. 1582 @ 1:17 p.m. Surely he noticed that she took two rest breaks in her vehicle on April 19, 2005; the first one was for 7 minutes beginning at 4:17 p.m. and the second was for 22 minutes beginning at 4:34. When she left her car the second time, she was wearing a neck brace. 1579. Resting for 29 minutes in her car in the middle of the afternoon, wearing a neck brace, wearing wrist braces, walking with her hands in her pockets, and driving a car with pillows supporting her back is pain behavior.

     Defendant claims that the videos show plaintiff doing things "contrary to what she had told him [Krames] she was capable of doing." Def's Opp Brief 3/28-4/1. What things? Defendant claims that Ms. Chellino was only wearing braces in the 2005 surveillance videos because "she undoubtedly was warned by Dr. Padgett that she might be under observation." Def's Opp Brief 3/5-6. How does defendant explain Ms. Chellino being filmed with wrist braces on May 11, 2004, prior to Dr. Padgett being shown the videos? 1583 @ 5:25 p.m.

     The defendant writes, in support of the merits of its position, that Dr. Padgett, the plaintiff's treating doctor, "repeatedly reported to Aetna that she continued to improve 'tremendously.'" In support of this allegation the defendant points to documents 295 and 311. Def's Opp Brief 2/7-10. Document 311 is unintelligible. Defendant takes the word, "tremendously," out of context in document 295. What Dr. Padgett wrote was, "I have been Marie Chellino's primary treating physician for her pain condition for some time now, approaching

5 years. Although she has tremendously improved from where she was when I first started treating her, at this time I don't believe that Marie is at a point where she would [be] able to work in any occupation." 295. Misinterpreting a treating doctor's statements out of context was discussed in <u>Saffon v. Wells, Fargo</u> 511 F.3d 1206 fn 4 (9th Cir. 2008). The court held that it "could be a sign of either inattention to important details or bad faith. In either event, it suggests less deference should be given to the decision of the claims administrator."

Defendant writes, "Plaintiff's statement that Dr. Marks and Dr. Krames were in disagreement is inexplicable." Let me explain. Dr. Krames wrote, "She enjoys horseback riding and at the direction of her physician and physical therapist, she has been instructed to visit her horse barn daily. . . . She rides approximately 15-20 minutes at a time; occasionally, she does this two times a week." 330. At the time he wrote this, he found Ms. Chellino to be totally disabled. 337. Obviously Dr. Krames did not believe that horseback riding necessarily precluded total disability. Dr. Marks, on the other hand, wrote, "Any person that can . . . mount and ride a horse, cannot in any reasonable way be thought of as being disabled from work." 893.

Further, defendant wrote in its Motion for Summary Judgment that one of the reasons for the termination of benefits was that Dr. Marks, "an independent, Board-certified rheumatologist opined that . . . her treating physician's statements regarding alleged disability were internally inconsistent." Def's MSJ 2/25-27. Nowhere in his report does Dr. Marks write that Dr. Padgett, or any other doctor that treated the plaintiff, made statements that are internally inconsistent. Dr. Marks does write that the plaintiff's "physiatrist . . . kept noting how much she was improving, although the claimant kept grading her pain exactly the same, 8-9/10." 893. Defense counsel, pushing the envelope a bit, may interpret this statement of Dr. Marks to mean that Dr. Padgett was inconsistent. If so, Dr. Krames never noted in either of his reports any inconsistency in Dr. Padgett's

records -- another example of Drs. Marks and Krames disagreeing.

Defendant overstates the plaintiff's position in order to knock it down. Aetna writes that Ms. Chellino attempted "to portray her equestrian activities as only infrequent and casual." Def's Opp Brief 2/20. Certainly she did not do that with Dr. Krames. As stated above, Dr. Krames wrote that he was told that the plaintiff goes to the horse barn every day and that she rides the horse 2 to 3 times a week. 336. It would be nice if the defendant would cite to a page in the administrative record to support its factual allegations.

Dr. Marks wrote, "A Functional Capacity Evaluation done in April of 2006 noted there is significant pain focused behavior, leading to **inconclusive results**." 892. The person that administered the FCE wrote, "High pain focus interfered with client's ability to perform to maximum ability. **Unable to accurately assess her abilities**." 855. An Aetna internal note describes the FCE in this case as an invalid test. 1388. Aetna wrote to Ms. Chellino, "the results of the testing resulted in the FCE not being valid because it was determined that you were not fully participating." 843. An article about FCE's in the administrative record says, "Reporting a lack of full participation to the employer or insurer may have repercussions for the client. Therefore, a reliable and valid method of determining subject participation is vital, **but none have been supported by current research**." 593. In other words, when the subject of a FCE says that pain is preventing him from performing some task, there is no way to know it the person's performance is prevented by pain or not. Dr. Marks assumed that Ms. Chellino was faking and used that assumption as the basis for his opinion that she was not disabled. 893. He never met her and never spoke to her. He based his conclusion on a test that everyone agreed was invalid. That is not just arbitrary and capricious. It is dishonest.

Defendant misstates the plaintiff's position regarding the decision in <u>Abatie v. Alta</u> 458 F.3d 955 (9th Cir. 2006). Defendant writes, "plaintiff misstates

Abatie, arguing that mere existence of a structural conflict (because Aetna funds and also decides claims) precludes deference." Def's Opp 6/24-26. As seems to be her custom, defense counsel gives no citation to the plaintiff's Motion for this statement. In fact, the plaintiff wrote, quoting from Abatie, 969, "'Plaintiffs will have the benefit of an abuse of discretion review that always considers the inherent conflict when a plan administrator is also a fiduciary, even in the absence of 'smoking gun' evidence of conflict.' Thus, even if there were no evidence of Aetna's inherent conflict of interest affecting its decision, the court must apply a modified, less deferential, abuse of discretion review in judging Aetna's decision." Plaintiff's MSJ 13/2-8.

Defendant writes that while there may be no way to objectively test for Fibromyalgia, the disabling symptoms of the illness can be objectively tested for. Def's Opp 12/17-20. According to Dr. Krames, Ms. Chellino claimed that she was disabled by pain, discomfiture and fatigue. 329. What are the objective tests for pain, discomfiture and fatigue? Dr. Marks didn't mention any in his report. He mentioned objective tests for "musculoskeletal or neuromuscular abnormalities" but those were not the causes of Ms. Chellino's problems. 893. Dr. Krames did not mention any objective tests that could prove or disprove Ms. Chellino's claim. The first termination letter did not inform Ms. Chellino of specific tests that could prove her pain and fatigue. 841.

Sometimes words sound good but have no meaning. Saying that "physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis" is easy. The tough part is in identifying the objective tests. Just 2 months ago the Ninth Circuit wrote, "individual reactions to pain are subjective and not easily determined by reference to objective measurements. . . . Pain is a completely subjective phenomenon and cannot be objectively verified or measured. If MetLife is turning down Saffon's application for benefits based on Saffon's failure to produce evidence that simply is not available, that too may

bear on the degree of deference the district court shall accord MetLife's decision and on its ultimate determination as to whether Saffon is disabled." Saffon v. Wells Fargo, supra 1216-17. If Aetna terminated Chellino's benefits based on her failure to present objective evidence of pain and fatigue, that should bear on the degree of deference this court should give Aetna's decision.

Furthermore, if Aetna was aware of tests that could establish the claim objectively one way or the other, it was obligated to tell the plaintiff about the tests.

> "If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; **if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it.** There is nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters."
> Booton v. Lockheed 110 F.3d 1461, 1463 (9th Cir. 1997).

See also Saffon v. Wells Fargo, supra.

Finally, plaintiff raised several matters in her Motion for Summary Judgment that the defendant has failed to address. First, there is no evidence in the administrative record that the plaintiff can sit long enough to perform a sedentary job 8 hours a day 5 days a week. Next, the administrative record contains evidence that Ms. Chellino had cognitive problems and that she was using narcotic medicine. 760, 546, 743. All of the Aetna doctors ignored the effects of cognitive problems and the use of narcotics on Ms. Chellino's ability to work. Defendant offers no explanation for this failure.

Respectfully submitted,

Charles J. Fleishman