United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARIE CHELLINO,

    Plaintiff,

v.

KAISER FOUNDATION HEALTH PLAN, INC., et al.,

    Defendants.

_____/

No. C 07-03019 CRB

**MEMORANDUM AND ORDER**

Plaintiff Marie Chellino appeals the termination of her long-term disability benefits under the Kaiser Permanente Welfare Benefit Plan. After carefully considering the administrative record, the Court concludes that oral argument is unnecessary and GRANTS defendant's motion for summary judgment and DENIES plaintiff's motion. The Plan fiduciary's determination that Chellino is no longer disabled from working at any occupation was not an abuse of discretion.

## BACKGROUND

Chellino was employed as a programmer analyst for Kaiser Foundation Hospitals. While employed she was covered by the "Kaiser Permanente Welfare Benefits Plan" (the "Plan"). Among other things, the Plan provided long-term disability benefits through Aetna Life Insurance Company ("Aetna"). Kaiser Foundation Health Plan, Inc. ("Kaiser Foundation") was the Plan Administrator and Aetna the Claim Administrator.

The Plan defines "disability" for the purpose of receiving disability benefits as follows:

> You are considered totally disabled if, during the first 24 months of your disability, you are continuously unable to perform any and every duty pertaining to your occupation. After your disability continues for 24 months, you are considered totally disabled if you are continuously unable to engage in any and every occupation for compensation or profit for which are reasonably qualified by education, training or experience.

(AR 957)

Chellino last worked for Kaiser on June 26, 1996; she subsequently made a claim for long term disability benefits based on fibromyalgia. The then claims administrator, New York Life Insurance Company, approved her claim. Sometime thereafter Aetna succeeded York Life as claims administrator.

In September 2002, a nurse consultant reviewed the progress reports of Chellino's treating physician, Dr. Padgett, and concluded that as the reports showed some progress, for example, that Chellino could tolerate horseback riding three times a week, a physician should review the file for some direction. (AR 760-61)

The following month Aetna had a nurse evaluate Chellino's psychological symptoms as they relate to her physical illness. The nurse concluded that Chellino's vocational potential was very low and that her disability appears long-term, significant and with little prospect for improvement. (AR 747) Chellino reported that after 30 minutes of activity, such as walking, cooking, or showering, she must lie down and rest and that sometimes she will drive to a local stable for horseback riding or just visiting the horses. (AR 754) According to the nurse's notes, her riding consists of 20 minutes at most and usually someone assists her. (AR 755) Chellino explained that although she sees herself as permanently disabled and effectively out of the work force, she believes she will continue to improve. (Id.) The nurse thought that Chellino could benefit from an independent medical exam by a physician who specializes in fibromyalgia. (Id.)

A consulting clinical neuropsychologist reviewed Chellino's file and issued a report dated December 31, 2002. The neuropsychologist noted that the medical file did not indicate

2

that Chellino had a structured pain management plan or comprehensive psychosocial assessment. Although the neuropsychologist did not meet with Chellino, he noted that based on his review of the file, Chellino's perceived impairment is greater than the objective medical data would support. (AR 743-44)

Aetna asked Chellino for updated medical information in June 2003. Chellino's treating physician, Dr. Padgett, responded that Chellino remains totally and permanently disabled from fibromyalgia. He concluded that her prognosis is "extremely guarded," "although we are more hopeful at this time than we have been in the past three years that [Chellino] will continue to have reduced pain. Prognosis for return to work though is very bleak; and I don't anticipate she will ever be able to achieve gainful employment." (AR 62) Dr. Padgett spoke with an Aetna representative in August 2003. Dr. Padgett reported that Chellino had made some gains in the past six months and that recently she had engaged in limited horseback riding. (AR 58)

In an "Attending Physician Statement" dated February 17, 2004, Dr. Padgett reported that Chellino has improved "very slowly," but that she is not yet physically able to engage in vocational rehabilitation. (AR 59-61)

An Aetna medical reviewer's diary note of April 20, 2004 suggested that it might be helpful to conduct surveillance on Chellino to determine if she is more active than she reports. (AR 1250) Periodic surveillance was conducted on May 11, 12 and 15, 2004. Chellino was observed driving, grocery shopping, and riding a horse on May 11, and of driving, walking and shopping on May 12. On May 12 she was observed going for a 20 minute walk. (AR 17-26)

Aetna sent copies of the video surveillance to Dr. Padgett for his review. Dr. Padgett responded that although the videotape had shown that Chellino had been out of the house for 3.75 hours, it did not show the frequent breaks she must take, including lying down in the midst of riding her horse. He explained further that because Chellino almost always wears long sleeves, the videotape did not capture that Chellino wears bilateral wrist braces and that at nighttime she uses a headmaster collar. He also explained that he had encouraged

3

1  Chellino to ride her horse, as he believes the rhythmic motions are good for spinal
2  strenghtening and stability.  He concluded that although Chellino has "tremendously
3  improved" from when he first started seeing her five years ago, she is still unable "to work in
4  any occupation." (AR 225-26)
5       Aetna conducted further surveillance on April 17-19, 2005.  Chellino was not
6  observed at home on April 17 or April 18.  On April 19 she was observed driving, leading
7  horses, carrying a bucket, wearing her neck brace and not wearing her neck brace.  (AR 1-16)
8       Dr. Elliot Krames conducted an independent medical exam on June 12, 2005.
9  Chellino reported that pain, discomfort, and fatigue severely limit her ability to perform
10 activities of daily living, but also disclosed that she enjoys horseback riding and at the
11 direction of her physician and physical therapist visits her horse barn daily, a 15 to 20 minute
12 drive from her house.  She rides approximately 15 to 20 minutes at a time, and no more than
13 two times a week.   Based on his examination of Chellino and his review of the record, Dr.
14 Krames concluded that "[o]bjectively, there are very few objective findings that would be
15 consistent with this level of disability."  He nonetheless concluded that "[b]ased on this
16 woman's own account of her inability to perform activities of daily living and based on her
17 history of fibromyalgia, it is my belief that this woman is unable to compete in open labor
18 market for any and all occupations."  (AR 337)  Dr. Krames then recounted Chellino's
19 physical limitations with the caveat that "[b]ecause of very little objective findings in this
20 case, most of these restrictions and work capacity is [sic] based on this patient's self reported
21 symptoms; there are not actual objective findings to support them."  (Id.)
22      Chellino's file was subsequently reviewed by Aetna's medical director, Dr. Rick
23 Snyder.  Dr. Snyder concluded that the medical data in the file and the physical examination
24 findings from the independent medical examination do not support Chellino being "impaired
25 to a less than sedentary capacity."  He suggested further surveillance.  (AR 403)
26      Aetna subsequently sent the surveillance tapes to Dr. Krames for his review.  Dr.
27 Krames reviewed the tapes and issued a supplemental report.  Dr. Krames wrote:
28      What I saw in these tapes today was quite different than my perception of this
     woman's disability back in June.  This woman, in almost every single tape,

4

> walked without antalgic gait and without any degree of pain behavior seen. Ms. Chellino was able to use her left hand and right hand at will, although she was wearing braces on both extremities. She was able to pull her horses and she was able to lift herself on to the back of horse without difficulty or without any degree of pain being shown. Ms. Chellino was able to bend at her waist, she was able to turn left and right, and gaze left and right with her neck without any painful expressions seen. She was able to hold objects that appeared to be more than 2 pounds with both arms and she did not have to hold these objects, as she explained to me in June, 2004, against her chest.

(AR 446) As a result, Dr. Krames amended his earlier opinion:

> It is my opinion now, based on what I saw in these surveillance tapes, that Ms. Chellino is not severely limited in what she can and cannot do. She is obviously able to drive herself; she is able to shop herself; she is able to lift relatively heavy objects; she is able to get on and off a horse, and she is able to push and pull at will. Ms. Chellino apparently does not have any disability when it comes to fine manipulation with her right and left hands. It is my opinion that she should be able to be employed in an occupation[] that calls for her to do fine manipulation and to hold objects up to 5 pounds.

(AR 447)

Aetna's medical director, Dr. Snyder, again reviewed the file, including Dr. Krames' supplemental report. Dr. Snyder concurred that plaintiff is capable of full use of her hands at will and lifting up to five pounds, although noted that the extent of her capacity is unknown. He recommended a further assessment, including a Functional Capabilities Evaluation done over a two-day period with validity testing. He concluded that plaintiff's "physical capabilities and demonstrated activities are inconsistent indicating a level of capacity that is likely significantly greater than what is reported" by plaintiff and her treating physician. (AR 459-60)

A two-day Functional Capabilities Evaluation was scheduled with a physical therapist. The physical therapist reported that Chellino's performance was self-limited, that is, that the evaluation represents what she is willing to do rather than safe maximums. She insisted on lying down frequently and as a result participated in only 15 of the 27 sub tests. He also found a number of inconsistencies in her performance. (AR 847-857) For example, during the hand coordination tests she used her hands in a slow, awkward fashion which was inconsistent with the "ease and way she removed her wrist splints right after the hand coordination test to do the hand volumetric measurement." (AR 848)

5

Aetna performed a labor market survey in July 2006 which identified several available jobs that plaintiff could perform within the limitations identified by Dr. Krames' supplemental report. (AR 487-512) By letter dated August 31, 2006, Aetna terminated plaintiff's benefits, effective August 16, 2006. The letter explained that Aetna was relying on Dr. Krames' supplemental report, plaintiff's failure to fully participate in the Functional Capabilities Evaluation, and the vocational survey which identified available jobs at which she could work with the restrictions identified by Dr. Krames. (AR 841-845)

Chellino administratively appealed the decision, and in support of her appeal submitted additional documents, including November 28, 2006 and January 15, 2007 medical reports from a Dr. Rajiv Dixit, a rheumatologist. (AR 545-49) Dr. Dixit met with Chellino, but apparently did not examine her. He also reviewed the surveillance videos and determined that "[t]here is absolutely nothing on the video that would lead me to believe that the patient is not disabled from her fibromyalgia." (AR 549) Aetna then submitted the complete file, including plaintiff's new submissions, to an independent physician consultant, Dr. Alan Marks, who is board-certified in internal medicine and rheumatology. Dr. Marks opined that Chellino can work full time. First, he found that Chellino's refusal to participate fully in the Functional Capacity Evaluation suggests that she is attempting to continue to appear disabled. Second, he concluded that the surveillance videos contradict Chellino's extreme subjective reported disability: "Any person who can care for a horse, lead the horse on walks, and mount and ride a horse, cannot in any reasonable way be thought of as being disabled from work." Third, he viewed Dr. Krames' medical examination instructive given that, based on Chellino's subjective complaints Dr. Krames' found that she was disabled, but after he reviewed the surveillance tapes, he reversed his position. Finally, Dr. Marks concluded that Chellino's treating physician has simply been noting what Chellino tells him, and that he does not document his notes by examinations, x-rays, or testing. (AR 900-02)

In light of this evidence, Aetna upheld the decision to deny the appeal (AR 881-85) and this ERISA lawsuit followed.

**Standard of Review**

This Court reviews a challenge to an ERISA plan's denial of benefits de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115(1989). Thus, the default standard of review in ERISA cases is de novo unless the discretion to determine eligibility under the terms of the plan is "unambiguously retained." Kearney v. Standard Ins. Co., 175 F.3d 1084, 1090 (9th Cir. 1999) (en banc) (quotation omitted).

If the plan does confer discretionary authority as a matter of contractual agreement, then the standard of review shifts to abuse of discretion. See Firestone, 489 U.S. at 115. In this case the discretion to determine eligibility is unambiguously retained by the Plan fiduciary. The Plan confers on the fiduciary "discretionary authority to construe and interpret each and every document setting forth the applicable terms of a Plan," and "the discretionary authority to approve or deny claims for benefits under such Plan." The Plan also defines the fiduciary in this case as the insurer, that is, Aetna. (AR 909-910)

Because the Court applies an abuse of discretion standard to the denial of benefits, the fiduciary's decision can only be set aside if arbitrary and capricious. See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 875 (9th Cir. 2004). Fiduciaries abuse their discretion by rendering decisions without any explanation, construing provisions of the plan in a way that conflicts with the plan's plain language, or relying on clearly erroneous findings of fact in making benefit determinations. See Schikore v. BankAmerica Supplemental Retirement Plan, 269 F.3d 956, 960-61 (9th Cir. 2001); Taft v. Equitable Life Assur. Soc'y, 9 F.3d 1469, 1473 (9th Cir. 1993). A decision grounded on "any reasonable basis" is not arbitrary or capricious. Jordan, 370 F.3d at 875 (quotation omitted).

Finally, although the parties have filed motions for summary judgment, "[w]here the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists,

1  do not apply." Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999). Because
2  the abuse of discretion standard is apposite to the facts of this case, the Court will treat the
3  cross-motions for summary judgment as an opportunity to resolve the legal questions
4  presented by Chellino's claim.

## DISCUSSION

### A.    Conflict of interest

Even where, as here, an ERISA plan grants discretion to the plan administrator, the district court's review should be "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 967 (9th Cir. 2006) (en banc). Such a conflict exists where, for example, the plan administrator both administers the plan and funds it. See id. It is undisputed that such a conflict exists here.

In light of this conflict, the Court must tailor its abuse of discretion review "to all the circumstances before it." Id. at 968.

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

Id. at 968-69.

Plaintiff argues the Court must review Aetna's decision with a high degree of skepticism because the record reflects that Aetna acted in accordance with its financial interest. The Court disagrees.

First, plaintiff contends that she was denied a "full and fair review," see 29 U.S.C. § 1133(2), because Aetna did not send plaintiff all of the surveillance tapes until after plaintiff's administrative appeal was denied. There is nothing in the summary judgment record, however, that indicates that Aetna withheld any evidence from plaintiff or her

1 physician. To the contrary, the record reflects that Aetna repeatedly gave plaintiff the
2 opportunity to supplement the record and had her treating physician review the surveillance
3 tapes so that he could comment on whether they impact his disability determination. Aetna
4 was also consistent about its reasons for terminating plaintiff's benefits. See <u>Saffon v. Wells</u>
5 <u>Fargo & Co.</u>, 511 F.3d 1206, 1213-14 (9th Cir. 2008).

6       Second, plaintiff contends that Aetna's reliance on Dr. Marks is consistent with its
7 conflict of interest. She contends that Dr. Marks' opinion contradicts that of Dr. Krames
8 because Dr. Marks opined that anyone who could ride and lead a horse is not disabled;
9 however, Dr. Krames knew that plaintiff rode horses and frequently visited her stable and yet
10 still initially found plaintiff disabled. While it is true that Dr. Marks appears to have a more
11 rigid view than Dr. Krames of what activities disqualify one from being disabled from
12 sedentary work, Dr. Marks agreed with Dr. Krames' ultimate determination that plaintiff is
13 not disabled from performing sedentary work because the surveillance tapes show her
14 engaging in activities that are not consistent with her subjective complaints of pain.
15 In <u>Salley v. DuPont</u>, 966 F.2d 1011, 1015 (9th Cir. 1992), and <u>Pinto v. Reliance Standard</u>,
16 214 F.3d 377 (3d Cir. 2000), in contrast, the insurer accepted part of the treating physician's
17 opinion, but rejected–without adequate explanation–the physician's conclusion that the
18 claimant was disabled.

19       Next, plaintiff contends that "Aetna failed to come to terms with the fact that Marks'
20 opinion is also based on the plaintiff's performance on the FCE, a test that Aetna itself found
21 to be 'invalid.'" Plaintiff's Motion for Summary Judgment at 14. Dr. Marks relied on the
22 test, however, as evidence that plaintiff is continuing to appear disabled, a conclusion that is
23 consistent with the physical therapist's conclusion that the FCE represents what plaintiff was
24 willing to do rather than what she could do. Although plaintiff's inability to participate in the
25 FCE could be due to real physical limitations, in this case the physical therapist performing
26 the exam specifically found that plaintiff was unwilling rather than unable to participate and
27 supported her finding with numerous and specific examples of Chellino's inconsistent
28 behavior during the exam. (AR 848) Plaintiff does not cite a single case that suggests a

9

plan administrator/insurer cannot consider a report that a claimant refused to participate in a test in determining whether the claimant's subjective complaints are valid.

Plaintiff also contends that Aetna's rejection of plaintiff's treating physician's opinion demonstrates the need for a high degree of skepticism. As support for her contention she relies on Donaho v. FMC, 74 F.3d 894, 901 (8th Cir. 1996), which held that a "reviewing physician's opinion is generally accorded less deference than that of a treating physician." Donaho, however, was expressly abrogated by the Supreme Court's decision in Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003). Moreover, Dr. Krames did examine plaintiff and there is nothing in the record, from plaintiff's treating physician or otherwise, that contradicts his opinion that there is no objective medical evidence to support her complaints as to the level of her disability. Dr. Krames and plaintiff's treating physician simply disagree as to whether her actions as shown on the taps are inconsistent with her subjective description of her symptoms.

The fact that plaintiff was receiving social security benefits at the time Aetna terminated her benefits does not mean Aetna's decision is entitled to less deference. There is no evidence in the record that suggests that the social security administration determined that plaintiff is disabled from working at or around the time Aetna determined that she is no longer disabled--ten years after she originally began receiving long term disability benefits. Plaintiff also contends that Aetna ignored evidence that she was on narcotics and suffered from cognitive records. The pages she cites in the record (Plaintiff's Reply at 9), however, do not provide evidence that her ingestion of narcotics and/or her alleged cognitive impairment disabled her from working; simply reciting that one is on narcotics is not evidence that one cannot work.

In sum, while the Court recognizes that Aetna had a financial incentive to terminate plaintiff's benefits and thus its decision must be viewed with that conflict in mind, the Court's review of the record does not evidence malice, inconsistent reasons for the termination of benefits, failing to adequately investigate plaintiff's claim, or any other facts

that would cause this Court to weigh Aetna's conflict more heavily than is warranted by the mere existence of the conflict itself.  See Abati, 458 F.3d at 968-69.

**B.     Abuse of discretion review**

Aetna affirmed the termination of plaintiff's benefits based primarily on the opinions of Dr. Krames and Dr. Marks, both of whom opined that plaintiff could work at a sedentary position.  Based on its review of the record, the Court finds that it was not arbitrary and capricious for Aetna to do so.

Once Aetna learned in 2002 that plaintiff's condition had improved such that she could tolerate horseback riding it began to conduct an investigation.  It sent a nurse to plaintiff's home to evaluate her psychological symptoms as they relate to her physical illness, and, upon the nurse's recommendation, had a neuropsychologist review plaintiff's file.  The neuropsycholgist concluded that plaintiff's perceived impairment is greater than the objective medical data would support.  Aetna, however, did not terminate plaintiff's benefit; instead, it asked plaintiff for updated medical information.

In 2004, after receiving updated information from plaintiff's physician, Aetna conducted surveillance that showed plaintiff driving, shopping, walking and riding a horse.  Aetna sent the surveillance tapes to plaintiff's treating physician for his review and comment.  Nearly a year later Aetna conducted additional surveillance and then had plaintiff examined by Dr. Krames.  Dr. Krames initially found that the objective medical evidence did not support her claimed impairment, but nonetheless opined that she was disabled from working based on her subjective complaints.  Aetna's medical director then reviewed the file and concluded, as did Dr. Krames, that the medical evidence does not support her claim of disability.  Aetna then had Dr. Krames review the surveillance tapes and, upon his review of what plaintiff was actually capable of performing, he changed his opinion and concluded that she is not disabled.  Aetna's medical director reviewed the file again and issued a similar opinion, this time adding that her demonstrated activities are inconsistent with her disability claim.

11

Aetna still did not terminate benefits; instead, it ordered a Functional Capabilities Evaluation. The physical therapist, however, reported that plaintiff refused to perform some of the tests and gave specific examples of how Chellino's claim that she could not perform certain tasks was inconsistent with other activities during the test. After Aetna received the physical therapist's report, and performed a labor market survey that showed available sedentary jobs with the limitations imposed by Dr. Krames, Aetna terminated plaintiff's benefits effective August 2006, four years after it received information suggesting that plaintiff's ability to work might be greater than what she reports.

After plaintiff appealed, Aetna referred the file, including plaintiff's new evidence from Dr. Dixit, to Dr. Marks. Dr. Marks concurred with Dr. Krames that plaintiff is not disabled from work and explained that he rejected plaintiff's new evidence--from Dr. Dixit-- on the ground that he did not perform an exam on plaintiff and similarly explained his disagreement with the treating physician's opinion because it, like Dr. Krames' initial report, was based on plaintiff's subjective complaints which are contradicted by the surveillance tapes. After receiving this report, Aetna affirmed its denial of benefits.

Aetna's decision was not based on any clearly erroneous findings of fact; nor did Aetna fail to explain its decision. While its decision contradicted the opinion of plaintiff's treating physician, it was not against the "great weight" of the evidence, or even the weight of the evidence. Aetna's reliance on the surveillance tapes and the reports of Dr. Krames and Dr. Marks, is a "reasonable basis" for terminating plaintiff's benefits and therefore not arbitrary or capricious. Jordan, 370 F.3d at 875.

Plaintiff's challenge to Aetna's reliance on Dr. Krames' report is unavailing. She contends that the surveillance videos did not reveal anything that was not already known to Dr. Krames; plaintiff had disclosed her horseback riding, walking and driving. Dr. Krames, however, explained that what he viewed on the video was at odds with his perception of plaintiff's abilities gleaned from his examination. Moreover, Dr. Krames' initial disability finding was based solely on plaintiff's subjective description of her symptoms; he emphasized that he did not find any objective medical evidence to support her complaints. It

makes sense, then, that he might change his opinion after he saw a tape of plaintiff's activities as opposed to relying on her own description of what she can do.

Plaintiff also contends that Dr. Krames was biased or that Aetna somehow knew that he would find plaintiff able to work. This argument is based on an Aetna internal note that states that based on the Aetna employee's past experience, he or she believed that Dr. Krames' review of the video could cause him to rethink his opinion. (AR 1334). Dr. Krames, however, initially found plaintiff disabled even though he did not find any objective evidence to support her complaints; instead, he accepted her subjective description of her symptoms. He explained that the videotape contradicted his perception of her level of disability and therefore changed his opinion. There is nothing in the record that suggests his change of opinion was not sincere. Moreover, the Aetna employee's notation suggests that he or she was referring to past experience with surveillance tapes, not past experience with Dr. Krames. That Aetna paid Dr. Krames to review the tapes, and that an Aetna employee believed the fee charged was "excessive," does not make Dr. Krames' opinion unreliable.

The Court recognizes that Aetna's refusal to advise plaintiff of its prior experience with Dr. Krames suggests that Aetna has used Dr. Krames before and that Dr. Krames had rendered an opinion favorable to Aetna. In light of Dr. Krames' initial opinion, however, the Court cannot conclude that Aetna's retention of Dr. Krames was a sham. Moreover, a review of Dr. Krames' initial report compared with the videotapes suggests that Dr. Krames' supplemental opinion was not unreasonable; her description of her abilities as recorded in Dr. Krames' first report is at odds with much of what is recorded on the surveillance tapes.

Finally, plaintiff attacks Dr. Marks' emphasis on the lack of any objective medical evidence to support her subjective complaints. As one Court of Appeals has noted, fibromyalgia,

> also known as fibrositis [is] a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and-the only symptom that discriminates between it and other diseases of a rheumatic character-multiple tender spots, more precisely 18 fixed locations on the body (and the rule of

13

thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 916 (7th Cir. 2003) (internal quotation marks and citation omitted).  The court also added, however: "Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not and the question is whether [the plaintiff] is one of the minority."  Id. (internal quotation marks and citation omitted).  Based on their review of surveillance tapes that show what plaintiff is actually capable of doing as opposed to what she reports she is capable of performing, both Dr. Marks and Dr. Krames concluded that plaintiff is not one of the minority.  Aetna's reliance on those opinions was not an abuse of discretion.

## CONCLUSION

While Aetna had a financial interest to terminate plaintiff's benefits, the Court finds that Aetna did not abuse its discretion in finding that ten years after plaintiff first became disabled, she had improved to the point that she could perform available sedentary work.  Accordingly, defendant's motion for summary judgment is GRANTED and plaintiff's motion is DENIED.

**IT IS SO ORDERED.**

Dated: March 26, 2008

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE